#26623-aff in pt, rev in pt & rem-JKK

**2013 S.D. 96**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

   v.

KEVIN EDWARD BUCHHOLTZ,                            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE BRADLEY G. ZELL
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

MATT NAASZ
Assistant Attorney General
Pierre, South Dakota                                         Attorneys for plaintiff
                                                                         and appellee.


TRACI SMITH
Office of the Minnehaha
 County Public Defender
Sioux Falls, South Dakota                                Attorneys for defendant
                                                                         and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 4, 2013

OPINION FILED **12/18/13**

#26623

KONENKAMP, Justice

[¶1.]        Kevin Edward Buchholtz appeals his convictions for two counts of first-degree rape, one count of sexual contact, and one count of indecent exposure, all involving a single child victim.

## Background

[¶2.]        B.L., age six, and her family moved into a trailer park in Valley Springs, South Dakota in June 2011.  On Saturday, June 11, 2011, B.L. went over to visit one of her neighbors, Kevin Buchholtz.  She had been there earlier in the week with some other children.  This time she came alone.  Buchholtz was cleaning his garage.

[¶3.]        B.L. would later testify in trial that while in the garage, Buchholtz told her to pull down her pants: "I pulled them down when he said."  "[T]hen he touched my pee-pee . . . with his finger."  She said that he touched her both on the outside and the inside.  Buchholtz asked her, "Does that feel good?"  She responded, "Kind of."  She pulled her pants back up.  Then, she testified, Buchholtz took her into his bedroom, where he again had her pull down her pants and he "touched [her] pee-pee."  She indicated that he used his right hand index finger to touch the outside and inside of her vagina.  She then saw Buchholtz's "pee-pee" with his pants "[d]own a little bit" and "[h]e squirted stuff out, like lotion or something."  He later washed the "lotion" off his hands in the bathroom.  She testified that Buchholtz gave her a drink: "It was kind of a Pepsi or something."  When they went back outside, he said, "Here is a doll for you, if you don't tell no one."  She took the doll

-1-

and left.  That night while in the tub, she told her grandmother what had happened.

[¶4.]       At trial, Buchholtz, then age fifty-seven, denied any sexual contact with B.L. or exposing himself to her.  She had been to his home, he said, the previous weekend with some other girls.  They had asked to use the bathroom.  While in the kitchen, "I looked up and I seen her head poking out of my bedroom.  And I asked her what she was doing and she just kind of smiled."  He told her, "You can use the bathroom and get out.  You're not to be in that bedroom."  In recounting the day in question, he told the jury that when she arrived, he had her help him by picking up bolts and screws off the floor.  They played a guessing game for a short while, and he returned to his chores.  While he was working, she said to him, "Hey, look."  He turned around; she "had raised her shirt up."  "I says, no, this is not right.  And I says, put it down, and I pushed it down on her."  B.L. asked to use his bathroom.  She went inside for five minutes.  He remained in the garage.  Later, he gave her a drink and chips and a doll that had been left behind by a girlfriend's grandchild.  When a friend then came over to visit, B.L. soon left.  Buchholtz testified that the next day he went over to B.L.'s grandmother's house.  But the grandmother was upset and told him to leave.  Confused by this response, he said she offered him no explanation.

[¶5.]       The investigation began on Monday, June 13, two days after the incident, when B.L.'s mother took her to the Department of Social Services (DSS) to report a rape.  The next day upon referral from DSS, Detectives Jennifer VanRoekel and Derek Kuchenreuther of the Minnehaha County Sheriff's Office visited B.L. and

her mother.  B.L. described the events at Buchholtz's home.  VanRoekel arranged for a forensic interview at Child's Voice for the following day.

[¶6.]		At Child's Voice, Colleen Brazil, a forensic interviewer, questioned B.L. Brazil later testified at trial that B.L. said Buchholtz touched both inside and outside her vaginal area.  Brazil said that B.L. was able to demonstrate a masturbating motion Buchholtz made before "white stuff," as B.L. put it, squirted from his penis.  B.L. also described a black blanket on Buchholtz's bed and said that at the time she was in his bedroom, he wore black pants and black underwear.  B.L. also recalled a flowery shirt on Buchholtz's floor.  Dr. Nancy Kertz, Ph.D. in Nursing, observed the forensic interview and conducted a physical examination of B.L.  The physical examination was normal.

[¶7.]		After observing the forensic interview, VanRoekel obtained an arrest warrant for Buchholtz and a search warrant for his home.  When executing the search warrant, officers seized a floral pattern shirt, a black comforter, several pairs of men's black underwear, and a pair of black jean shorts on the floor of Buchholtz's bedroom.  The clothing appeared consistent with B.L.'s descriptions.  Buchholtz was charged with eleven counts, including rape, sexual contact, and indecent exposure. Counts one through four involved B.L.  Counts five through eleven involved other alleged victims.

[¶8.]		At trial, VanRoekel testified about her investigation.  On cross-examination, defense counsel asked her:

> **Q:** And [Buchholtz] continually denied touching [B.L.] inappropriately?
>
> **A:** Yes.

> **Q:** And you would expect a denial from somebody who was falsely accused of a crime?
>
> **A:** Yes.

On redirect, over Buchholtz's objection, the State asked VanRoekel:

> **Q:** Would you also expect a denial from someone who had done the crime?
>
> **A:** Yes.
>
> **Q:** Why is that?
>
> . . . .
>
> **A:** Okay. It's hard — this is something very hard for people to admit to it, they're going to be in the media. People are always going to remember that. The only thing worse that [sic] this type of crime is having somebody killed. It's the second worse type of crime that we deal with, is sex crimes against kids. It's very hard for people to admit when they have done something like that and to have other people know about it, so they will deny it initially.

[¶9.] As an expert witness for the State, Dr. Kertz testified that she observed no abnormal findings during her physical examination, but said that was not unusual. She explained that ninety-five percent of sexually abused children exhibit no physical findings of sexual abuse. Nonetheless, Dr. Kertz testified that based on the many "contextual details" about what B.L. heard, felt, and saw, Dr. Kertz had sufficient evidence to make a medical diagnosis of "child sexual abuse." Buchholtz's objection to this opinion was overruled.

[¶10.] The jury found Buchholtz guilty of counts one through four, and the State dismissed counts five through eleven. He was sentenced to 25 years on count one (with credit for time served), 25 years on count two, 15 years on count three (with five years suspended), and two years on count four (suspended), with all sentences to be served consecutively.

-4-

[¶11.] On appeal, Buchholtz asserts the following errors: (1) allowing VanRoekel's opinion on why defendants accused of sex offenses against children do not confess during interrogation; (2) admitting B.L.'s statements made to the forensic interviewer; and (3) allowing Dr. Kertz to give a medical diagnosis of "child sexual abuse."[1]

### 1. Investigator's Opinion on Absence of Confession

[¶12.] Buchholtz argues that the trial court erroneously allowed VanRoekel to testify about why defendants accused of sex crimes against children fail to confess during interrogation. Ruling that Buchholtz opened the door to this line of questioning, the court permitted the testimony. Courts have discretion to allow an ordinarily inadmissible inquiry when an adversary "opens the door" to that line of inquiry. *Veith v. O'Brien*, 2007 S.D. 88, ¶ 27, 739 N.W.2d 15, 24 (citations omitted); *State v. Letcher*, 1996 S.D. 88, ¶¶ 25-26, 552 N.W.2d 402, 406-07 (citations omitted).

[¶13.] Buchholtz asked VanRoekel on cross examination: "And you would expect a denial from somebody who was falsely accused of a crime?" In response,

---

1. We review the trial court's evidentiary rulings under an abuse of discretion standard. *State v. Scott*, 2013 S.D. 31, ¶ 9 n.1, 829 N.W.2d 458, 461 n.1 (citing *State v. Engesser*, 2003 S.D. 47, ¶ 15, 661 N.W.2d 739, 746). Also, "[w]e review a trial court's 'decision to admit or deny an expert's testimony under the abuse of discretion standard.'" *State v. Kvasnicka*, 2013 S.D. 25, ¶ 18, 829 N.W.2d 123, 128 (quoting *State v. Lemler*, 2009 S.D. 86, ¶ 18, 774 N.W.2d 272, 278). An abuse of discretion is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* ¶ 17 (quoting *Lemler*, 2009 S.D. 86, ¶ 40, 774 N.W.2d at 286). If there was error, we must then determine whether it was "prejudicial error that 'in all probability' affected the jury's conclusion." *Id.* ¶ 19 (quoting *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 59, 764 N.W.2d 474, 491).

the State asked on redirect: "Would you expect a denial from someone who had done

the crime?" VanRoekel answered "Yes," and explained:

> Okay. It's hard — this is something very hard for people to admit to it, they're going to be in the media. People are always going to remember that. The only thing worse [than] this type of crime is having somebody killed. It's the second worse type of crime that we deal with, is sex crimes against kids. It's very hard for people to admit when they have done something like that and to have other people know about it, so they will deny it initially.

[¶14.]     From our point of view, had it not been for Buchholtz's question on

cross-examination, the jury would have heard nothing about what could be inferred

from an accused child molester's denial. When Buchholtz inquired into the

significance of his denial, the door was opened, and the court had discretion to allow

the State to put the denial in context and prevent a potentially misleading inference

to lodge in the minds of the jurors.

[¶15.]     Buchholtz further maintains that VanRoekel did not have the proper

training or educational background to offer such an opinion. He objected at trial to

the rebuttal testimony as beyond the scope of VanRoekel's expertise and training.

But it was Buchholtz who initially asked VanRoekel what she would expect an

interviewee to do in that situation. Again, Buchholtz opened the door to this

testimony, even if it may have been inadmissible in other circumstances.

[¶16.]     Lastly, Buchholtz contends that VanRoekel's testimony invaded the

province of the jury by insinuating that Buchholtz was lying. "This Court has long

held that the credibility of a witness — whether a witness is telling the truth — is a

question for the jury." *State v. Larson*, 512 N.W.2d 732, 742 (S.D. 1994) (citing

*State v. Wooley*, 461 N.W.2d 117 (S.D. 1990)). Although Buchholtz acknowledges

that VanRoekel did not directly say that he was lying, he maintains that VanRoekel's testimony was still inappropriate. For authority, he cites *State v. Welch*, 490 N.W.2d 216 (Neb. 1992). There, an investigator testified, according to his experience and training, to certain behaviors that occur when a person is giving a deceptive answer. The investigator gave the jury an impression that the defendant was lying during his interrogation by testifying that he observed signs of deception in the defendant's demeanor similar to those deceptive behaviors he previously testified to. The Nebraska Supreme Court ruled the evidence inadequate to establish that the investigator's techniques could be used to prove that a person who exhibited those behaviors was lying. *Id.* at 221. Therefore, the court held that it was error to permit the investigator to testify on the administration of his various techniques. *Id.* As the defendant's credibility was central to the issue of consent, this opinion testimony was prejudicial. *Id.* Buchholtz believes his situation is precisely the same as in *Welch*.

[¶17.]     But in *Welch*, the investigator directly tied the deceptive traits he testified about to the defendant's behavior. VanRoekel's testimony, on the other hand, did not tie any trait to a characteristic Buchholtz exhibited. Her statements were general comments regarding how a detective would expect an accused to act and why. And again, this testimony was in rebuttal to a question Buchholtz asked. The trial court found that VanRoekel did not testify that Buchholtz was lying, but only made general statements about the type of reactions expected from an accused. We see no abuse of discretion here.

## 2. Admission of Child Victim's Statement to Forensic Interviewer

[¶18.] Buchholtz argues that B.L.'s hearsay statements made during a forensic interview with Colleen Brazil were improperly admitted. Hearsay statements from a victim of child sexual abuse are admissible if the court finds in a hearing outside the presence of the jury that the time, content, and circumstances of the statements provide sufficient indicia of reliability and the child either testifies or is unavailable. SDCL 19-16-38.[2]

[¶19.] "As witnesses, children are neither inherently reliable nor inherently unreliable. Each child's statement must be evaluated on its own merits." *State v. Cates*, 2001 S.D. 99, ¶ 11, 632 N.W.2d 28, 34. In evaluating these statements, the trial court should consider several factors, including:

---

2. SDCL 19-16-38 provides in part:

> A statement made by a child under the age of thirteen, or by a child thirteen years of age or older who is developmentally disabled as defined in § 27B-1-18, describing any act of sexual contact or rape performed with or on the child by another, or describing any act of physical abuse or neglect of the child by another, or any act of physical abuse or neglect of another child observed by the child making the statement, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant or in any proceeding under chapters 26-7A, 26-8A, 26-8B, and 26-8C in the courts of this state if:
>
> (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
>
> (2) The child either:
>
>   (a) Testifies at the proceedings; or
>   (b) Is unavailable as a witness.
>
> . . . .

(1) the child's age and maturity;

(2) the nature and duration of the abuse;

(3) the relationship of the child to the offender;

(4) the coherence of the statement, bearing in mind that young children may sometimes describe incidents in age appropriate language and in a disorganized manner;

(5) the child's capacity to observe, retain, and communicate information;

(6) the nature and character of the statement itself, considering the child's developmental limitations in understanding and describing sexual behavior;

(7) any motivation of the child to make a false allegation or a false denial;

(8) the child's susceptibility to suggestion and the integrity of the situation under which the statement was obtained; and

(9) all the circumstances under which the statement was made.

*Id.* (citations omitted). "No single consideration is dispositive. Trial courts must examine the totality of the circumstances surrounding the statement." *Id.* (citing *Idaho v. Wright*, 497 U.S. 805, 819, 110 S. Ct. 3139, 3148-49, 111 L. Ed. 2d 638 (1990)). "A decision on reliability must be made before the admission of hearsay evidence." *Id.* (citing *State v. Buller*, 484 N.W.2d 883, 886 (S.D. 1992)).

[¶20.]        Here, before trial, the court conducted a hearing to determine the admissibility of B.L.'s out-of-court statements. Both B.L. and Brazil testified. The court found B.L. to be competent. It also found that B.L.'s statements passed the test for indicia of reliability under SDCL 19-16-38. Accordingly, the court ruled the statements admissible through Brazil. Buchholtz argues that B.L.'s statements to Brazil were questionable and unreliable. But the trial court found otherwise. And the court appropriately considered and weighed the applicable factors in determining whether to allow the statements. "A trial judge is vested with wide

-9-

discretion in determining competency and, on appeal, its ruling is entitled to great weight, as it has had the opportunity to see and hear the child." *State v. Guthmiller*, 2003 S.D. 83, ¶ 12, 667 N.W.2d 295, 301 (quoting *State v. Anderson*, 2000 S.D. 45, ¶ 23, 608 N.W.2d 644, 653). We conclude that there was no abuse of discretion.

### 3. Expert Diagnosis of "Child Sexual Abuse"

[¶21.] Buchholtz argues that Dr. Kertz's medical diagnosis of "child sexual abuse" invaded the province of the jury and vouched for the credibility of the child witness. Dr. Kertz was asked: "As a result of your exam, did you formulate a diagnosis?" Buchholtz objected to the question. In overruling the objection, the trial court reasoned that "as long as the expert witness doesn't say . . . the defendant is innocent or guilty of committing this crime" the opinion is not precluded. Dr. Kertz answered: "My medical diagnosis is child sexual abuse." She testified that B.L.'s physical exam was "normal"; there were no "tears or swelling or redness."

[¶22.] Dr. Kertz went on to explain that "ninety-five percent or more [of sexually abused children have] no physical findings." On redirect, when asked how she could diagnose child sexual abuse when the physical exam was normal, Dr. Kertz testified that B.L. "was able to provide specific details that — contextual details that would be an indicator of child sexual abuse. Details that, developmentally, a six-year-old girl would not have unless she experienced that type of event." Those contextual details, Dr. Kertz added, "are what the child describes: What they see. What they hear. What they feel. You know, meaning in their

environment. Things that were said to them. How things felt. And in some — in some cases, how things might taste."

[¶23.] In allowing this diagnosis of sexual abuse, the trial court relied on *State v. Moran*, where we wrote that "[a]n expert can testify as to the ultimate issue 'as long as the witness is not asked whether the defendant is innocent or guilty.'" 2003 S.D. 14, ¶ 43, 657 N.W.2d 319, 329. For this proposition, *Moran* cited *State v. Barber*, 1996 S.D. 96, ¶ 38, 552 N.W.2d 817, 823, where we upheld expert testimony on the customs, practices, and operating methods of narcotics dealers. Yet in *Moran*, all we approved was a doctor's opinion "regarding whether [the victim's] injuries were consistent with sexual assault." 2003 S.D. 14, ¶ 44, 657 N.W.2d at 329. Thus *Moran* marks no meaningful departure from our established precedent.

[¶24.] It is true that since 1993, when we adopted SDCL 19-15-4 (Rule 704), an expert's opinion is not inadmissible merely "because it embraces an ultimate issue to be decided by the trier of fact." SDCL 19-15-4. But not "all expert opinion on the ultimate issue is admissible." *State v. Raymond*, 540 N.W.2d 407, 410 (S.D. 1995) (citation omitted). "It is the function of the jury to resolve evidentiary conflicts, determine the credibility of witnesses, and weigh the evidence." *State v. Packed*, 2007 S.D. 75, ¶ 34, 736 N.W.2d 851, 862 (quoting *State v. Svihl*, 490 N.W.2d 269, 274 (S.D. 1992)). As the Federal Advisory Committee Notes declare, "The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions." Fed. R. Evid. 704 advisory committee's note. Indeed, "[o]pinions merely telling a jury what result to reach are impermissible as intrusive, notwithstanding

the repeal of the ultimate issue rule." *State v. Guthrie*, 2001 S.D. 61, ¶ 33, 627

N.W.2d 401, 415 (citation omitted).

[¶25.]    We have generally limited expert testimony to explaining the

characteristics of sexually abused children and comparing those characteristics with

the account and behavior of a particular child.[3]  Here, Dr. Kertz's testimony went

beyond comparing characteristics to an outright medical diagnosis of "child sexual

abuse."  And Dr. Kertz based her "diagnosis" not on her own physical exam of the

child, in which she found no evidence of sexual abuse, but on the child's statements

given during Colleen Brazil's forensic interview.  Thus, the gravamen here is not

simply that an opinion on an ultimate issue was admitted, but that an expert

witness was permitted to directly comment on the credibility of another witness by

means of a diagnosis.

[¶26.]    Most jurisdictions restrict this type of expert testimony, raising

concerns about improper bolstering of credibility and invading the province of the

---

3.    *See Cates*, 2001 S.D. 99, ¶ 19, 632 N.W.2d at 36 (allowing testimony tying
      general characteristics of child sexual abuse victims to a particular victim);
      *State v. Edelman*, 1999 S.D. 52, ¶ 21, 593 N.W.2d 419, 423 (expert testimony
      regarding the symptoms of child sexual abuse is permissible); *State v.
      Bachman*, 446 N.W.2d 271 276-77 (S.D. 1989) (testimony offered to inform
      the jury of the characteristics displayed by one sexually abused did not reach
      an ultimate fact and did not invade the province of the jury); *State v. Floody*,
      481 N.W.2d 242, 249 (S.D. 1992) (testimony of social services worker on the
      characteristics of a sexually abused child did not invade the province of the
      jury); *State v. Spaans*, 455 N.W.2d 596, 599 (S.D. 1990) (permitting expert
      testimony concerning the traits and characteristics typically found in
      sexually abused children).

jury on determining an ultimate issue.[4]  A few jurisdictions permit these opinions.[5]

Some even acknowledge that the testimony is bolstering, and still allow it.[6]

[¶27.]        A case we find particularly helpful is *United States v. Whitted*, where

an expert witness testified: "My final diagnosis was that [victim] had suffered

repeated child sexual abuse."  11 F.3d 782, 785 (8th Cir. 1993).  The Eighth Circuit

ruled the testimony improper, stating:

> In the context of child sexual abuse cases, a qualified expert can
> inform the jury of characteristics in sexually abused children
> and describe the characteristics the alleged victim exhibits. . . .
> A doctor who examines the victim may repeat the victim's

---

4.     *See State v. Brown*, 302 P.3d 1214, 1216 (Or. Ct. App. 2013) (diagnosis of
       sexual abuse is not admissible under Oregon statute in the absence of
       physical evidence of abuse); *State v. Cressey*, 628 A.2d 696, 699 (N.H. 1993)
       (the expert testimony was not sufficiently reliable to prove a child has been
       sexually abused); *Commonwealth v. Mendrala*, 480 N.E.2d 1039, 1042 (Mass.
       App. Ct. 1985) (an expert witness may not be asked whether a rape or sexual
       assault has occurred); *State v. Stancil*, 559 S.E.2d 788, 789 (N.C. 2002) ("trial
       court should not admit expert opinion that sexual abuse has *in fact* occurred
       because, absent physical evidence supporting a diagnosis of sexual abuse,
       such testimony is an impermissible opinion regarding the victim's
       credibility").  *See also State v. Favoccia*, 51 A.3d 1002, 1009 (Conn. 2012)
       ("[A]lthough expert witnesses may testify about the general behavioral
       characteristics of sexual abuse victims, they cross the line into impermissible
       vouching and ultimate issue testimony when they opine that a particular
       complainant has exhibited those general behavioral characteristics.")

5.     *See State v. Edward Charles L.*, 398 S.E.2d 123, 141 (W. Va. 1990) (expert
       may give an opinion on whether the child has been sexually abused); *Large v.
       State*, 177 P.3d 807, 812 (Wyo. 2008) (expert can state an opinion that
       someone is a victim of sexual assault but cannot vouch for the credibility of
       the victim); *Glendening v. State*, 536 So. 2d 212, 220 (Fla. 1988) ("A qualified
       expert may express an opinion as to whether a child has been the victim of
       sexual abuse." (citations omitted)).

6.     *See State v. Timperio*, 528 N.E.2d 594, 596-97 (Ohio Ct. App. 1987) (citing
       *State v. Myers*, 359 N.W.2d 604, 609-10 (Minn. 1984)) (acknowledging that
       the testimony is bolstering another's credibility but still allowing the expert
       to opine that a child was sexually abused).

> statements identifying the abuser as a family member if the victim was properly motivated to ensure the statements' trustworthiness. . . . A doctor can also summarize the medical evidence and express an opinion that the evidence is consistent or inconsistent with the victim's allegations of sexual abuse. . . . Because jurors are equally capable of considering the evidence and passing on the ultimate issue of sexual abuse, however, a doctor's opinion that sexual abuse has in fact occurred is ordinarily neither useful to the jury nor admissible.

*Id.* (citations omitted). It was permissible, the court held, "for [the expert witness] to summarize the medical evidence and express [an] opinion that [the] medical findings were consistent with [the victim's] claims of sexual abuse." *Id*. at 786. But a diagnosis of "repeated child sexual abuse" went too far. *Id.* An expert witness cannot base the diagnosis solely on the victim's allegations of abuse. *Id.*

[¶28.] Trial courts must be careful to distinguish between expert opinion that helps the jury and expert opinion that merely endorses a witness's testimony.[7] An expert's role is to "assist the trier of fact to understand the evidence or to determine a fact in issue[.]" SDCL 19-15-2 (Rule 702). That role is not to tell the trier of fact what to decide, shifting responsibility from the decision maker to the expert. *Guthrie*, 2001 S.D. 61, ¶ 33, 627 N.W.2d at 415. When the ultimate issue was whether Buchholtz sexually abused B.L., and Dr. Kertz testified that her medical diagnosis was "child sexual abuse," she was, in essence, putting a certificate of veracity on the child's testimony and telling the jury what to find.[8] With no

---

7. *See generally* Anne Bowen Poulin, Credibility: A Fair Subject for Expert Testimony? 59 Fla. L. Rev. 991 (2007).

8. The State argues that diagnosing "child sexual abuse" does not invade the province of the jury because Dr. Kertz did not tie the abuse to a person, place, or time. That critical causal connection, the State argues, was appropriately

(continued . . .)

physical evidence of abuse, all she had to analyze was the child's account. As the *Whitted* Court explained, experts cannot pass judgment on a witness's truthfulness in the form of a medical opinion. *Whitted*, 11 F.3d at 785-86 (citing *United States v. Azure*, 801 F.2d 336, 339-41 (8th Cir. 1986)).

[¶29.] To summarize, in child sexual abuse cases, qualified experts can inform the jury of characteristics in sexually abused children and describe the characteristics the child exhibits. *Cates*, 2001 S.D. 99, ¶ 19, 632 N.W.2d at 37; *Whitted*, 11 F.3d at 785. Experts "can also summarize the medical evidence and express an opinion that the evidence is consistent or inconsistent with the victim's allegations of sexual abuse." *Whitted*, 11 F.3d at 785. On the other hand, "jurors are equally capable of considering the evidence and passing on the ultimate issue of sexual abuse," and so an opinion that sexual abuse actually occurred based solely on a victim's statement is inadmissible. *Id.* Accordingly, we conclude that the trial court abused its discretion in allowing Dr. Kertz's opinion of sexual abuse.

[¶30.] We also conclude that this opinion was prejudicial for two reasons. First, as we have recognized in other cases, expert testimony holds an "aura of reliability and trustworthiness [that] surround[s] scientific evidence." *Kvasnicka*, 2013 S.D. 25, ¶ 35, 829 N.W.2d at 131 (alterations in original) (quoting *State v. Werner,* 482 N.W.2d 286, 291-92 (S.D. 1992)). Dr. Kertz's "medical diagnosis" acted in effect as independent evidence of the offense. Yet it was simply an endorsement

───────────────────────────────

(. . . continued)

left to the province of the jury. But the fact is that only Buchholtz was on trial, and there was no evidence offered that someone else had raped B.L.

of the child witness's testimony. Second, one of the defense theories was that B.L. may have been confused or mistaken about what really happened at Buchholtz's home. Defense witnesses testified that she had been acting strangely in the week before the day in question, entering other neighbors' bedrooms without permission. And B.L. had told her grandmother at the same time she reported Buchholtz's actions that, in another garage, two neighbor boys had shown her their penises. Yet, in the absence of any physical evidence of rape, Dr. Kertz's opinion put to rest, with an air of medical certainty, any question about whether B.L. had somehow imagined or fabricated what happened with Buchholtz.

[¶31.]     We have always been receptive to the use of expert testimony to help jurors understand issues of behavior, perception, and memory with child witnesses. But like most courts we disapprove opinions from experts claiming to know the truthfulness of other witnesses. Experts can fairly testify to what types of behaviors might indicate child sexual abuse, give insights through expert evaluation of a witness, and educate jurors on matters that will help them to assess credibility, as indeed Dr. Kertz did here, but her testimony crossed the line into improper assessment of ultimate credibility when she testified that the child was sexually abused. To allow that kind of opinion raises the prospect of future trials with opposing experts telling jurors which witnesses they should believe, all under the guise of rendering a diagnosis.

[¶32.]     We affirm in part, reverse in part, and remand for a new trial.

[¶33.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.