#30087-a-SPM
**2023 S.D. 41**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

VANDON PRETTY WEASEL,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHELLE K. COMER
Judge

\* \* \* \*

ELLERY GREY of
Grey & Eisenbraun Law
Rapid City, South Dakota                    Attorneys for defendant
                                       and appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                       and appellee.

\* \* \* \*

ARGUED
APRIL 26, 2023
OPINION FILED **08/02/23**

#30087

MYREN, Justice

[¶1.] Vandon Pretty Weasel was convicted of ten counts of sexual contact with a child under age sixteen and one count of first-degree rape. At his trial, the State introduced evidence from Debra Hughes, a mental health practitioner, who had served as the victim's counselor. The State did not notify Pretty Weasel that Hughes would give expert testimony. On appeal, Pretty Weasel alleges this failure of notice was prejudicial and asserts that Hughes' testimony improperly bolstered the victim's testimony. We affirm.

## Factual and Procedural History

[¶2.] Pretty Weasel and his wife, Jennean, were married in 2012. Five children were living in their house at the time of the events that give rise to this case. Jennean has two children with Pretty Weasel and two with Vincent Barrios. A.D., the victim in this case, is the child of Jennean and Barrios and was twelve years old at the time of trial. Also living with the family from the fall of 2015 until the spring of 2020 was Pretty Weasel's child from another relationship, K.P., who was sixteen years old at the time of trial.

[¶3.] On the morning of March 10, 2020, Jennean noticed that A.D. was acting "very, very upset" and was refusing to go to school. Jennean thought something was not right, so she took her daughter on a drive to talk. While on this drive, A.D. told her mother that Pretty Weasel had been touching her inappropriately and doing so for a very long time.

[¶4.] Jennean went home and confronted her husband, who said he was sorry. She told him he needed to leave, and he moved out of the house. The next

day, Jennean filed a report with the police in Deadwood and met with Detective

Tom Derby, who set up a forensic interview for A.D.

[¶5.]          Brandi Tonkel, a forensic interviewer at the Children's Home Child

Advocacy Center (CAC), conducted the interview. During the interview, A.D.

disclosed extensive sexual contact. She stated that Pretty Weasel had touched her

"all around down there" and that it occurred almost "every night."

[¶6.]          After the forensic interview, Detective Derby, who had listened to the

interview, asked Jennean if she would agree to conduct a recorded phone call with

Pretty Weasel to see if they could obtain additional evidence to support A.D.'s

disclosures. Jennean agreed to do so. During this phone call, Pretty Weasel told

Jennean that he felt "so fricking guilty." When Jennean asked him why he did

what he did to A.D., he said he thought she was Jennean. Jennean then asked, "[s]o

you touched her inappropriately?" to which Pretty Weasel responded, "I didn't teach

her, I don't want [A.D.] to be a liar and I didn't teach her to be a liar. I mean if she

says then . . . I feel guilty."

[¶7.]          Later in the same recorded conversation, Jennean asked when this had

started, and Pretty Weasel said that A.D. was the one who started it and that it had

started with belly rubs. He then said,

> And the first time went you know, didn't notice but she kind of
> grabbed my hand higher, under her chest. And I was like whoa.
> I stopped. I thought--thought she was being curious. You know
> I just--I don't know what--what to think. I didn't know what to
> . . . And then she just pushed my hand lower a couple of times.

When pressed about how often this happened, Pretty Weasel said, "[l]ike once a

month. If that." He said he did not remember how old A.D. was when it started

and that it only happened when Jennean was gone. Pretty Weasel said he never had sex with A.D. or put his fingers in her. He said he did not touch her but stated, "[w]ell, she put my hand there."

[¶8.] A grand jury indicted Pretty Weasel on twelve counts of sexual contact with a minor under age sixteen (two counts for each year from 2015-2020) and one count of first-degree rape occurring sometime in 2020.

[¶9.] Before trial, Pretty Weasel filed a motion to require the State to provide a summary of any expert opinion it intended to use at trial pursuant to SDCL 23A-13-4. Pretty Weasel also filed a motion for a subpoena duces tecum seeking any counseling records involving A.D., followed by an in-camera review by the court to determine relevancy. Without objection from the State, the circuit court granted both motions. The court signed a subpoena duces tecum on February 11, 2022, directing Hughes to produce all counseling records for A.D. and provide them to the court by February 14, 2022. Hughes was ill and unable to deliver the documents by that date. Instead, both parties received the counseling records on the first day of trial, after jury selection.

[¶10.] Jennean was the State's first witness, and she explained how A.D. disclosed the abuse to her and how she reported it to law enforcement. She also discussed the recorded phone call she conducted with Pretty Weasel under the guidance of Detective Derby. A recording of the phone call and a transcript were received into evidence, and the recording was played for the jury.

[¶11.] On cross-examination, Jennean acknowledged that A.D. had previously told her that K.P. had touched her inappropriately. Jennean explained

that the family attended counseling with Hughes because of K.P.'s conduct, and sometimes A.D. did not want to attend. The defense also asked Jennean if A.D. had told Hughes that she did not like Pretty Weasel because he spanked her as a form of discipline. Jennean acknowledged that A.D. may have said that to Hughes but later testified that A.D. had not expressed to her personally that A.D. was upset about being spanked.

[¶12.]    On redirect, Jennean testified that Hughes had diagnosed A.D. with PTSD (post-traumatic stress disorder). The State then asked her whether Hughes ever mentioned that A.D. was unable to tell the difference between what K.P. had done to her and what Pretty Weasel had done. Pretty Weasel objected to the question based on "improper 702, unnoticed 702," and invading the province of the jury, but the court overruled the objection. Jennean responded that she did not recall what Hughes had told her.

[¶13.]    The State also asked Jennean if Hughes had reported to her that A.D. wanted to dress in a particular way that would make her less attractive as a female. The defense objected as "speculation and foundation and confrontation[,]" but the objection was overruled. Jennean responded, "[A.D.] does not feel comfortable in tight-fitting clothing. She wants to wear bigger clothing to cover up herself." The State later asked if A.D. exhibited any behavior where she tried to make herself look unappealing. Jennean answered that A.D. had experienced trauma multiple times from two different people and that she was very insecure, wanted to cut off her hair, and would only wear loose and baggy clothing.

[¶14.]    A.D. testified about telling her mother that Pretty Weasel had been touching her. She said she told her mother Pretty Weasel had been touching her but did not "tell her the detailed stuff[.]" A.D. testified that the touching had been going on for a long time at a frequency that "felt like every day." She thought the touching started around age four with just "a backrub and stuff[,]" but then as she got older, he touched her inappropriately "[d]own in the area" or "private area." The State clarified with her that she meant her vagina.

[¶15.]    When the abuse started, A.D. did not know it was wrong and thought it was "a normal thing." She realized it was wrong when she was around seven or eight years old after watching some videos. She said it would happen a lot, "[l]ike every day." A.D. stated that Pretty Weasel only touched her with his hands, and he mostly would rub her vagina but sometimes "put his fingers between it." Sometimes she would be sleeping and would awake to him touching her. A.D. said after she realized it was wrong, it made her feel upset and gross when he would touch her. She said she told Pretty Weasel that she did not like it, and there was one time when she tried to stop him physically, she kicked her feet and elbowed him, and he stopped. The touching would typically occur at night when her mother was working.

[¶16.]    A.D. also discussed one incident where Pretty Weasel had asked her if she was interested in touching a boy's private part, but she said no. A.D. discussed another time when she had wanted a stuffed animal, and he asked her, "[w]hat's in it for me?" She knew this meant that he wanted to touch her. He took her pants and underwear off and her legs were over his shoulders. He put his head between

her legs and kissed up and down her legs and then kissed her private area. After this incident, he took her to the store and purchased the stuffed animal she wanted. A.D. thought she was in about second grade when this happened.

[¶17.]     A.D. testified that Pretty Weasel told her that he was sorry for what he had done to her and that he had apologized to her a lot of times. However, she did not believe him because he kept doing these things to her. He had told her not to tell anyone about what he was doing because it would destroy the family.

[¶18.]     A.D. also discussed the prior incidents where her stepbrother K.P. touched her inappropriately on her private part. He had done this two times, and she had told her mother about the touching. On cross-examination, she stated that she was nine years old when he first touched her, and she knew it was wrong. A.D. acknowledged that Pretty Weasel supported her going to counseling with Hughes for the situation with K.P. and that he had taken her to counseling. Sometimes the whole family would go to counseling together; other times they did individual counseling. She said she talked to Hughes about K.P.'s conduct. A.D. also stated that Pretty Weasel had asked her if she had told Hughes about what he had done to her.

[¶19.]     A.D.'s biological father, Vincent Barrios, testified that in 2015, A.D. was staying with him one weekend when she grabbed his penis and started giggling. She said that Pretty Weasel let her touch him there and told Barrios that Pretty Weasel touched her. She told Barrios that Pretty Weasel "itches" her and "puts his hands down and plays with my panties." Barrios said he called Jennean and told her about this. Jennean talked with A.D., and A.D. told her she had lied.

Barrios nonetheless reported the allegation to law enforcement. A forensic interview was conducted, but A.D. did not disclose any sexual abuse, and no charges were filed at the time.

[¶20.] Detective Derby testified that he observed A.D.'s 2020 forensic interview at the CAC. After the interview, he suggested to Jennean that they make a recorded phone call with Pretty Weasel, and Jennean agreed to make the call. He told her to be herself when talking to Pretty Weasel but wrote down some bullet points to try to cover during the conversation. During Detective Derby's testimony, the court also admitted into evidence a message that A.D. received on her tablet from Pretty Weasel saying, "I love you. I'm very sorry for everything." Pretty Weasel sent the message two days after A.D. disclosed the abuse to her mother, but before Tonkel's forensic interview.

[¶21.] In her testimony, Tonkel, described the general process when interviewing children. She explained that during her interview, A.D. disclosed chronic incidences of sexual assault that had happened what felt like every day. She stated that A.D. reported digital penetration as well as cunnilingus. The court admitted the CAC interview and a transcript of the interview into evidence and published the video for the jury, which substantially conformed to A.D.'s testimony at trial.

[¶22.] Tonkel further testified that she had conducted the forensic interview with A.D. in 2015, but A.D. had not disclosed any sexual abuse by Pretty Weasel at that time. Tonkel also discussed common characteristics in child sex abuse cases. She explained that delayed disclosure and secrecy are common, especially when the

perpetrator is a family member. She also explained that children that have experienced sexual abuse are frequently able to provide details of conduct that would ordinarily be beyond the years of such a child. Tonkel explained that cunnilingus and digital penetration would typically involve knowledge beyond the years of a ten-year-old child.

[¶23.] Hughes was the last witness to testify. She stated she was a child trauma therapist with an independent practice, a master's degree in social work, and a license to practice in South Dakota. She stated she uses "the modality of trauma-focused child behavioral therapy[.]" She had conducted counseling with all of the children in the Pretty Weasel family. Her work with them started when Pretty Weasel contacted her after K.P. had touched A.D. in an inappropriately sexual way. Hughes stated that she had conversations with A.D. about A.D. wanting to be a boy because if she were a boy, she would not be touched. The following exchange then occurred:

| | |
|---|---|
| State: | Did [A.D.] exhibit any signs that you worked with her on as far as a lack of hygiene? |
| Hughes: | Yes. |
| State: | Okay. And what was that indicative of in your profession? |
| Defense: | I'm going to object. Unnoticed 702, improper 702. |
| Court: | Overruled. You can answer. |
| Hughes: | In [A.D.'s] personality and presenting herself during our sessions, she felt the more unattractive and ugly and hideous, if you will, her behaviors and how she looked was, people would stay away from her and she was safer. |

[¶24.] Shortly after this line of questioning, the State asked about diagnosing A.D. with PTSD:

| | |
|---|---|
| State: | What was your diagnosis of [A.D.]? |

| | |
|---|---|
| Defense: | Objection. 702, State versus Buchholtz. |
| Court: | Well, these records were subpoenaed, I believe, at your request and they were given to both parties and I'm going to allow it. |
| State: | What was your diagnosis? |
| Hughes: | Post-traumatic stress disorder. |
| State: | And what does that mean? |
| Hughes: | That is an event where an individual fears being harmed or the harm of someone else and, as a result of that fear, then they have different behaviors and actions that continue to reproduce fear and the need to protect. |
| State: | Is she being treated for that now? |
| Hughes: | Yes. |
| State: | By you? |
| Hughes: | Yes. |
| State: | Did you see things that indicated to you that there was something more going on here than what had happened at the hands of [K.P.]? |
| Defense: | Objection. Calls for speculation, improper 702, unnoticed 702. |
| Court: | Sustained. |

[¶25.]     The defense conducted a brief cross-examination where Hughes was asked if A.D. had told her she did not like Pretty Weasel because he spanked her. Hughes responded that she did recall that. On redirect, the State asked Hughes if there was any connection between the spanking and A.D.'s sexual assault allegations. The defense objected based on "[i]mproper 702, beyond the scope, unnoticed 702[,]" which the court overruled. Hughes responded,

> So children are very compartmentalized thinkers and in that minute, when you say, "Do you like him," and if there is an event that has occurred where he's punished her or spanked her, whatever, that is going to be what she speaks to. So it is not uncommon for her to say, "I don't like him. He spanked me." I do not see the two incidents connecting at all.

[¶26.]     The State rested, and Pretty Weasel did not present any witnesses. The jury found Pretty Weasel not guilty on the two sexual contact charges

stemming from acts in 2015 but found him guilty on the other ten counts of sexual contact with a minor under the age of sixteen and the first-degree rape charge. The court sentenced him to ten years in the penitentiary on each of the sexual contact counts to be served concurrently and 25 years in the penitentiary on the first-degree rape count to run consecutively to the sexual contact sentences.

[¶27.]     Pretty Weasel raises two issues on appeal concerning the admission of unnoticed expert testimony and alleged improper bolstering of the victim's testimony by an expert witness.

## Standard of Review

[¶28.]     "We review a [circuit] court's decision to admit or deny an expert's testimony under the abuse of discretion standard." *State v. Janis*, 2016 S.D. 43, ¶ 13, 880 N.W.2d 76, 80 (alteration in original) (quoting *State v. Johnson*, 2015 S.D. 7, ¶ 30, 860 N.W.2d 235, 247). We similarly review evidentiary rulings under an abuse of discretion using a two-step process. First, whether there was an abuse of discretion. Second, whether the error was prejudicial. *See State v. Hankins*, 2022 S.D. 67, ¶ 20, 982 N.W.2d 21, 30. "An abuse of discretion is a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence. It is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* ¶ 21 (internal quotations and citations omitted).

> **1.     *Whether Pretty Weasel preserved the expert witness issues for appellate review.***

[¶29.]     First, the State argues that Pretty Weasel waived the ability to challenge any of Hughes' testimony on appeal because he did not object when the

State called Hughes as a witness, and when he did object to specific questions, he "did not expand on why it was improper."* "To preserve issues for appellate review litigants must make known to the [circuit] courts the actions they seek to achieve or object to the actions of the court, giving their reasons." *State v. Bryant*, 2020 S.D. 49, ¶ 18, 948 N.W.2d 333, 338 (alteration in original) (quoting *State v. Dufault*, 2001 S.D. 66, ¶ 7, 628 N.W.2d 755, 757). This ensures "that the circuit court has an opportunity to correct any error." *State v. Guzman*, 2022 S.D. 70, ¶ 26, 982 N.W.2d 875, 886 (quoting *State v. Divan*, 2006 S.D. 105, ¶ 9, 724 N.W.2d 865, 869).

[¶30.] The circuit court entered an order requiring the State to notify the defense of any expert testimony it intended to present. The State was therefore obligated to provide such notice before offering expert testimony. The State solicited testimony from Hughes; Pretty Weasel objected because he believed it was expert witness testimony. These objections sufficiently presented the issues to the circuit court and preserved them for appellate review.

### 2. *Whether Hughes testified as an expert.*

[¶31.] There are three pieces of testimony from Hughes that Pretty Weasel argues qualified as expert testimony requiring advance notice under the circuit court's order and SDCL 23A-13-4: (1) the significance of the victim's appearance and lack of hygiene; (2) Hughes' diagnosis of A.D. with PTSD; and (3) the connection or lack thereof between A.D. being angry about being spanked by the defendant and

---

* "[W]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *State v. Bryant*, 2020 S.D. 49, ¶ 18 n.2, 948 N.W.2d 333, 338 n.2 (quoting *United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 1777, 123 L. Ed. 2d 508 (1993)).

A.D.'s allegations of sexual abuse.  The State contends Hughes did not provide any expert testimony.

[¶32.]      Lay witness testimony is governed by SDCL 19-19-701, which provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a)      Rationally based on the witness's perception;
> (b)      Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c)      Not based on scientific, technical, or other specialized knowledge within the scope of § 19-19-702.

Opinion testimony from qualified experts is governed by SDCL 19-19-702.

[¶33.]      The State specifically asked Hughes what a lack of hygiene was "indicative of *in your profession*?"  (Emphasis added.)  By invoking Hughes' profession, the State sought her "scientific, technical, or other specialized knowledge" based on her expertise as a child trauma therapist.  Hughes would have similarly been required to use such knowledge to diagnose A.D. with the mental health disorder of PTSD.  Hughes' testimony on these two items constituted expert testimony because it "was beyond the knowledge and experience of the average layperson." *See State v. Andrews*, 2001 S.D. 31, ¶ 18, 623 N.W.2d 78, 83.

[¶34.]      It is not as evident that Hughes' testimony on redirect regarding the lack of a connection between A.D.'s statement that she disliked Pretty Weasel because he spanked her and A.D.'s allegations that Pretty Weasel sexually abused her was expert testimony.  Making a connection between statements about two events does not necessarily require specialized knowledge; a layperson could make such a connection.  However, in her response to the question, Hughes described her

professional understanding of a child's thought process before stating that she did not see the events as connected. Because Hughes' testimony was based on "scientific, technical, or other specialized knowledge[,]" it constituted an expert opinion. Her expert testimony was subject to the court's pretrial orders requiring timely expert opinion disclosure.

> **3.** ***Whether the circuit court abused its discretion by allowing the State to present unnoticed expert testimony.***

[¶35.] Before trial, the circuit court ordered the State to provide Pretty Weasel with advance notice of any expert witness and a summary of their expert opinions. Although the State provided Pretty Weasel with a notice of intent to call Tonkel as an expert in sexual assault, it provided no such notice as to Hughes.

[¶36.] The circuit court granted a motion from the defense for a subpoena for A.D.'s counseling records in July 2021. Because the production of the records was delayed, the parties did not receive them until halfway through the first day of trial, after jury selection but before opening statements.

[¶37.] Nonetheless, in *State v. Blem*, this Court stated that "[o]nce an expert opinion is known to the State and the State determines that it will solicit that opinion in court, it must disclose the opinion to the defense regardless of the number of days or hours before the witness is scheduled to testify." 2000 S.D. 69, ¶ 40, 610 N.W.2d 803, 811. This holding was based on SDCL 23A-13-15, which provides, "[i]f, prior to *or during trial*, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under §§ 23A-13-1 to 23A-13-14, inclusive, he shall promptly notify the other party

-13-

or his attorney or the court of the existence of the additional evidence or material." (Emphasis added.) In *Blem*, the State asserted that it did not find out about an expert's conclusions until only a day before he testified. This Court held that the State was still required to disclose the opinion to the defense despite the late notice because "[p]arties are not granted immunity from discovery orders merely because the trial has commenced." *Blem*, 2000 S.D. 69, ¶ 40, 610 N.W.2d at 811.

[¶38.] Here, the State did not provide the required expert witness notice to Pretty Weasel because it was a last-minute decision to call Hughes as a witness after receiving the counseling records that Pretty Weasel had subpoenaed. Still, *Blem* establishes that the State must provide advance notice before calling an expert witness. If the State had provided the required notice, Pretty Weasel could have placed the issue before the circuit court for its consideration, outside the jury's presence, and before the State presented any expert witness testimony.

[¶39.] Although Pretty Weasel has established that the circuit court abused its discretion by allowing the State to present expert witness testimony in violation of its pretrial order, he must also establish that the admission of that testimony constituted prejudice. Our record review reveals that Hughes' unnoticed testimony did not affect the jury's verdict. *See Hankins*, 2022 S.D. 67, ¶ 21, 982 N.W.2d at 30. Earlier in the trial, defense counsel elicited testimony from Jennean during cross-examination about the family attending counseling with Hughes and that A.D. told Hughes that she did not like Pretty Weasel because he spanked her. On redirect and without objection from the defense, the State elicited testimony from Jennean that Hughes had diagnosed A.D. with PTSD. The State elicited further testimony

from Jennean about A.D.'s efforts to alter her appearance. Hughes' testimony about these things was duplicative, but she also provided an expert witness explanation of the significance of A.D.'s efforts to alter her appearance. Additionally, Hughes testified that she did not see a connection between A.D.'s disclosures of sexual abuse and any anger she may have expressed about Pretty Weasel spanking her.

[¶40.] Despite this testimony from Hughes, Pretty Weasel was not precluded from arguing to the jury that A.D. had a motive to fabricate, given her expressed anger toward him. Pretty Weasel thoroughly presented this theme throughout his closing argument, and neither party mentioned Hughes' testimony in their closing arguments. We are convinced that even if this expert testimony from Hughes had been excluded, it would have had no effect on the verdict because of the overwhelming nature of the other evidence presented to the jury. Therefore, Pretty Weasel has not established any prejudice from the admission of this unnoticed expert testimony.

### 4. Whether Hughes' testimony constituted improper bolstering of the victim's testimony.

[¶41.] Pretty Weasel next argues that Hughes' expert opinions, including the significance of the lack of hygiene, the PTSD diagnosis, and the lack of connection between the spanking and allegations of abuse, all improperly bolstered A.D.'s testimony. Pretty Weasel cites *State v. Buchholtz* in support of his argument. In that case, the defendant was charged with first-degree rape and sexual contact. An expert for the State testified that she had diagnosed the child with "child sexual abuse." 2013 S.D. 96, ¶ 9, 841 N.W.2d 449, 454. This Court found that such a diagnosis essentially "put[ ] a certificate of veracity on the child's testimony" and

"t[old] the jury what to find." *Id.* ¶ 28, 841 N.W.2d at 459. We stated that "[t]rial courts must be careful to distinguish between expert opinion that helps the jury and expert opinion that merely endorses a witness's testimony. . . . [An expert's] role is not to tell the trier of fact what to decide, shifting responsibility from the decision maker to the expert." *Id.*

[¶42.] In this case, Hughes did not discuss the cause of the PTSD, only that she had diagnosed A.D. with the disorder and was treating her for it. Expert testimony regarding sexual abuse is generally limited "to explaining the characteristics of sexually abused children and comparing those characteristics with the account and behavior of a particular child." *Id.* ¶ 25, 841 N.W.2d at 457. "Experts can fairly testify to what types of behaviors might indicate child sexual abuse, give insights through expert evaluation of a witness, and educate jurors on matters that will help them to assess credibility," *id.* ¶ 31, 841 N.W.2d at 460, but they "cannot pass judgment on a witness's truthfulness in the form of a medical opinion[,]" *id.* ¶ 28, 841 N.W.2d at 459.

[¶43.] Hughes was not asked and did not testify that A.D. was diagnosed with child sexual abuse. However, while discussing the PTSD diagnosis, the State attempted to probe the cause of A.D.'s PTSD, inquiring of Hughes: "[d]id you see things that indicated to you that there was something more going on here than what had happened at the hands of [K.P.]?" However, defense counsel immediately objected. The court sustained the objection and prevented Hughes from providing the type of testimony that would have been an impermissible "direct[ ] comment on the credibility of another witness by means of a diagnosis." *See id.* ¶ 25, 841

N.W.2d at 458. Hughes did not testify regarding a direct causal link between A.D.'s PTSD and Pretty Weasel's conduct. Additionally, the State did not discuss the cause of A.D.'s PTSD or Hughes' other expert opinions in its closing argument.

[¶44.]     As for Hughes' testimony about A.D.'s appearance and lack of hygiene, her observation that A.D. felt safer and believed people would stay away from her if she were unattractive and ugly is not the type of expert testimony found problematic in *Buchholtz*. While Hughes was not asked whether this behavior would be consistent with that exhibited by children who had been sexually abused, this was the obvious implication of her testimony. *Buchholtz* notes that this is the type of expert testimony that is generally acceptable. *See id.* ¶ 25, 841 N.W.2d at 457.

[¶45.]     Finally, as we noted above, Hughes' opinion about A.D.'s allegations of abuse being unrelated to her statement about being spanked by Pretty Weasel was elicited in response to questions defense counsel asked Hughes to support Pretty Weasel's theory of a possible motive for A.D. to lie. Hughes did not offer an opinion about whether A.D. was truthful or whether the abuse had happened. Instead, it was simply Hughes' observation that she did not perceive any connection between A.D.'s statement that she disliked Pretty Weasel because he spanked her and A.D.'s sexual allegations against Pretty Weasel. She was not attesting to the validity of A.D.'s statements regarding either topic. Therefore, Hughes' testimony did not improperly bolster A.D.'s testimony.

[¶46.]     We affirm.

#30087

[¶47.] JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.