2025 PA Super 260

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| AUSTIN JACOB KNIGHT | : | |
| | : | |
| Appellant | : | No. 579 MDA 2025 |

Appeal from the PCRA Order Entered March 31, 2025
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0000062-2019

BEFORE:  OLSON, J., MURRAY, J., and LANE, J.

OPINION BY MURRAY, J.:                           **FILED: NOVEMBER 17, 2025**

Austin Jacob Knight (Appellant) appeals from the order dismissing his timely first petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  After careful review, we affirm.

Appellant's convictions involve sexual offenses against a minor complainant, R.K.  On January 25, 2018, R.K. reported to police that Appellant, who was 28 years old, had sexually assaulted her on October 31, 2017, when she was 16 years old.  On February 25, 2019, the Commonwealth charged Appellant with one count each of aggravated indecent assault without consent, sexual assault, indecent assault without consent, unlawful contact with a minor, and corruption of minors.[1]  Ryan Barrett, Esquire (trial counsel),

---

[1] 18 Pa.C.S.A §§ 3125(a)(1), 3124.1, 3126(a)(1), 6318(a)(1), 6301(a)(1)(ii).

represented Appellant. The matter proceeded to a jury trial on October 5, 2020.

A prior panel of this Court summarized R.K.'s trial testimony as follows:

[R.K.] explained that she and Appellant had met in August of 2017 at Skateaway, a skating rink in Wilkes Barre[, Pennsylvania], and had developed a friendship. Appellant was aware from the outset that [R.K.] was only 16 years old, and Appellant led [R.K.] to believe that he was in his early twenties. As time passed, Appellant garnered [R.K.'s] and [R.K.'s] mother's trust, and [R.K.], with her mother's approval, began to rely on him for transportation [from] the skating rink. The relationship between Appellant and [R.K.] soon alienated [R.K.] from her friends, however, and she became estranged from them.

Eventually, the friendship between [R.K.] and Appellant evolved into a sexual relationship. [R.K.] testified that this "confused her" because she "never really had any sexual knowledge in general[,]" but that she ignored her instincts because she thought "this is what people do, I shouldn't be saying anything. You know, this is normal." N.T., 10/5/20, at 39. [R.K.] testified that Appellant kissed her[,] touched and digitally penetrated her vagina[,] and touched her breasts. She testified that, by the fall of 2017, she was uncomfortable with Appellant's actions, which included the performance of oral sex on her. She further testified that she told Appellant she did not want him to perform oral sex on her, but that he would do it anyway. She also testified that when she expressed feeling uncomfortable in sexual situations, Appellant would persuade her that he cared about her and just wanted to "make [her] feel good." *Id.* at 40. [R.K.] testified that, ultimately, she realized that Appellant had been grooming her for sexual abuse by talking her into thinking a sexual relationship was what she wanted.

On the night of October 31, 2017, [R.K] went to a haunted house with Appellant. While the two were standing in line, Appellant "would press himself up against" [R.K.] with his "penis [] against [her] butt." *Id.* After the haunted house, Appellant and [R.K.] returned to [R.K.'s] home where, on [R.K.'s] front porch, Appellant penetrated [R.K.'s] vagina digitally and performed oral sex on her[,] even though she expressed to Appellant that she did not want him to. Later, the two retreated

to [R.K.'s] basement[,] where Appellant's sexual advances escalated and culminated in Appellant performing oral sex and intercourse with [R.K.] against her will. [R.K.] testified that she "said that I didn't want to. I said that very firmly that night. It was the only time that I could say [] without a doubt that I completely and honestly didn't want to do anything, and I made it very clear." *Id.* at 46.

***Commonwealth v. Knight***, 290 A.3d 688, 481 MDA 2021 (Pa. Super. 2022) (unpublished memorandum at 3-5) (footnotes omitted; record citations modified).

R.K. testified that the intercourse concluded with Appellant ejaculating on her stomach. N.T., 10/5/20, at 50. Afterward, R.K. "ran upstairs" and "grabbed a towel." *Id.* She stated, "I decided to wipe off the semen and keep the towel because at that point I knew I was going to go to law enforcement because I just couldn't take it anymore." *Id.* R.K. testified she "saved [the towel] in a plastic bag and kept it until [she] went" to the police. *Id.*

R.K. did not immediately report the incident, testifying that she had "an urge to do something, but then I didn't because I lost the confidence." *Id.* at 72. She continued to spend time with Appellant, though she stated their relationship "deescalated a lot" and she "became very, very distant." *Id.* at 51. R.K. testified Appellant took her on an overnight trip to a skating rink in New York on November 11, 2017, but "nothing sexual happened." *Id.* at 52, 70. R.K. testified Appellant lied to her, falsely telling her he had obtained her mother's permission to take her on the trip. *Id.* at 65. R.K. stated she was

"very distant with [Appellant] on this trip, and I remember him pointing that out." *Id.* at 70.

R.K. also testified that, after the sexual assault, Appellant gave her a Fender Stratocaster guitar worth $2,000. *Id.* at 53-54. R.K. stated Appellant knew she was interested in the guitar, as Appellant had talked about getting it for himself. *Id.* at 54. She testified, "[B]ut after the sexual assault and after I started getting distant, after things are looking weird, all of a sudden [Appellant] showed up in [the screened front porch of my house,] uninvited[,] after I told him I could not see him." *Id.* R.K. testified Appellant entered the porch without knocking and left the guitar, then texted her to tell her the guitar was on the porch. *Id.*

R.K. testified that she was

nervous because Appellant had begun yelling at her and being verbally abusive[,] causing [R.K.] to become afraid that Appellant would hurt her. She testified, however, that she feared cutting off all contact with Appellant because she "knew the risk." *Id.* at 53. [R.K.] … testified that she was also scared of Appellant because, on one occasion after the rape, Appellant, while intoxicated, approached [R.K.] and her mother at Skateaway and pulled out a knife.

[R.K.] testified that she did not tell anyone about the [assault] until January 2018. She explained that she came forward because she "was struggling after the main sexual assault experience. I realized that I was being groomed, and I didn't realize how long it was happening, obviously. Looking back on the situation[,] it made me feel like he was the only one there for me all of the time, so I felt like I needed to hold onto that, even though I was going through so much pain from it." *Id.* at 59-60.

***Knight***, 290 A.3d 688 (unpublished memorandum at 5-6) (footnotes omitted; record citations modified); ***see also*** N.T., 10/5/20, at 51 (R.K.'s testimony that she did not tell her mother about the assault until the day she told police, explaining, "I didn't want my mom to think [less] of me … because I had a sexual interaction….").

Officer Jason O'Hora (Officer O'Hora) of the Moosic Borough Police Department testified that on January 25, 2018, R.K.'s mother called the police to report that R.K. had been sexually assaulted. N.T., 10/5/20, at 116. Officer O'Hora conducted a "minimal fact interview" with R.K. at the police station, and scheduled a forensic interview at the Children's Advocacy Center for the following day. ***Id.*** On January 26, 2018, Officer O'Hora observed R.K.'s forensic interview, during which R.K. indicated she had preserved at her residence a towel she had used to wipe Appellant's semen off her stomach. ***Id.*** at 119. Later that day, Officer O'Hora went to R.K.'s residence, where she provided him with a blue and white towel. ***Id.*** Officer O'Hora subsequently submitted the towel to the Pennsylvania State Police (PSP) for testing. ***Id.*** at 123. After the towel tested positive for seminal fluid, Officer O'Hora obtained a sample of Appellant's DNA via search warrant. ***Id.*** at 124. Further PSP

testing confirmed Appellant's DNA matched the semen on the towel. *Id.* at 125.[2]

Pertinently, the Commonwealth presented expert testimony from Cheryl Friedman (Nurse Friedman), a certified nurse practitioner and Sexual Assault Nurse Examiner. *Id.* at 96. Nurse Friedman testified that she had worked at the Children's Advocacy Center since 2014, where she examined children "for the purpose of diagnosis and treatment of residual abuse." *Id.* at 97. Nurse Friedman indicated she had been involved in "[a]lmost a thousand exams having to do with sexual abuse…." *Id.*; *see also id.* at 98 (trial court accepting Nurse Friedman's qualifications as "an expert [witness] in forensic nurse practitioner with specialties in child sexual abuse….").

Nurse Friedman testified that, on January 26, 2018, she examined R.K. at the Children's Advocacy Center. *Id.* at 102. Immediately prior to the exam, R.K. underwent a forensic interview conducted by a trained forensic interviewer, which Nurse Friedman observed. *Id.* at 104. Nurse Friedman then spoke with R.K. and R.K.'s mother to obtain R.K.'s medical history. *Id.* at 104-05. Nurse Friedman agreed that, "for the purposes of medical treatment and diagnosis," R.K. gave Nurse Friedman "a brief summary of what

---

[2] Sara Worsnick, a PSP forensic serologist, testified that she tested the towel submitted by Officer O'Hora, and confirmed the presence of seminal fluid on the towel. N.T., 10/6/20, at 8-13. Melinda Charley, a PSP forensic scientist, testified that she conducted DNA testing on a seminal stain from the towel and a cheek swab from Appellant; she confirmed DNA from the seminal stain matched Appellant's DNA. *Id.* at 29-32.

brought her to the center that day[.]" *Id.* at 105. Nurse Friedman then conducted a "physical and sexual exam" of R.K., including a genital exam. *Id.* at 105-06.

Nurse Friedman testified that she observed "[n]o visible trauma" during the genital exam. *Id.* at 107; *see also id.* at 109 (Nurse Friedman confirming the genital exam "was normal."). However, Nurse Friedman stated that she "would not expect to see any physical findings" because of the length of time that had passed since the alleged assault. *Id.* Explaining that genital tissue heals quickly, Nurse Friedman testified that if R.K. "had trauma to that part of her body I would have expected it to have healed by the time that I see her." *Id.* at 109-10. Nurse Friedman further agreed that she would not expect to see physical trauma on the genital exam, even if R.K. had "reported that she experienced pain during the sexual assault…." *Id.* at 110.

Significantly, the Commonwealth's direct examination of Nurse Friedman concluded with the following exchange:

> Q: And based on your training and experience with a large number of examinations you have conducted in sexual assault cases, do you have an opinion within a reasonable degree of medical certainty as to the findings, the medical findings relating to [R.K.]?
>
> A: Yes.
>
> Q: What is it?
>
> A: **Sexual assault by her history**.

*Id.* at 110-11 (emphasis added).

Trial counsel began his cross-examination of Nurse Friedman as follows:

Q: You just stated that your assessment of sexual assault is based on history. Can you explain that a little bit more?

A: Because of what she talked about during her forensic interview and because of what she talked about when we … talked together during the medical history, she tells me a history of sexual assault.

Q: It's not based on any physical findings, just from her testimony[?]

A: Correct.

*Id.* at 111.

Trial counsel further questioned Nurse Friedman regarding the significance of the lack of physical trauma found during the exam:

Q: I know that you discussed that you would not typically see signs of injury, but in terms of forced vaginal penetration, is there anything you would typically see at this point in terms of the time from the alleged incident?

A: So I wouldn't expect to see anything since time had passed. And there are many scientific studies that match that up. That is what is expected.

Q: So you can't tell if something did or did not [happen]?

A: Correct, in most cases.

*Id.* at 112.

On redirect, the Commonwealth asked Nurse Friedman, "[D]oes the lack of physical injury negate the fact that [R.K.] was sexually assaulted?" *Id.* at 113. Nurse Friedman responded, "No, absolutely not." *Id.* On recross, trial counsel questioned Nurse Friedman as follows:

Q: You're stating that your opinion that she has been sexually assaulted based on—

A: My medical opinion, yes.

- 8 -

Q: Your medical opinion based on [R.K.'s] statement to you?

A: Yes.

*Id.* at 113.

The Commonwealth also presented testimony from Janet Bash (Ms. Bash), who was 24 years old at the time of trial, regarding her previous relationship with Appellant, which "resulted in Ms. Bash becoming pregnant at age 16."[3] *Knight*, 290 A.3d 688 (unpublished memorandum at 2). Ms. Bash testified

---

[3] In a pretrial motion *in limine*, Appellant sought to preclude Ms. Bash's testimony under Pa.R.E. 404(b)(1), which prohibits evidence of a defendant's prior bad acts "to prove a person's character" or demonstrate "that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). Rule 404(b)(2) provides that prior bad acts evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* (b)(2). The trial court determined Ms. Bash's testimony was admissible under Rule 404(b)(2) because

> [t]he similarities between [Appellant's relationships with Ms.] Bash and [R.K.] indicate a common plan in which Appellant earned the trust of naive, socially isolated minor females, initiated daily communication and regular contact, manipulated them into inappropriate touching and kissing, evolving into sexual contact, and eliciting sexual contact through confusion, verbal coercion, and physical force. Appellant created opportunities for [Ms.] Bash and [R.K.] to spend periods of time with him encouraging sexual conduct to occur. Appellant's daily interactions with [Ms.] Bash and [R.K.] conditioned the minor females to accept sexual conduct and be deterred from resisting or reporting the assaults.

*Knight*, 290 A.3d 688 (unpublished memorandum at 12-13) (quoting Trial Court Opinion, 3/9/22, at 26-27) (original brackets omitted). On direct appeal, Appellant challenged the trial court's admission of Ms. Bash's testimony, and this Court affirmed. *Id.* (unpublished memorandum at 10-13).

that at the time she met Appellant[,] she was depressed and did not have much of a social life. Ms. Bash's father worked with Appellant and introduced Appellant to Ms. Bash when she was 13 years old. When she was … 15 years old, her friendship with then-21-year-old Appellant[] became sexual. Also, around that time, Appellant moved into Ms. Bash's family's home. … Ms. Bash testified that she requested that Appellant use condoms when they had intercourse, but Appellant refused, explaining that they hurt him. Ms. Bash testified that she naively believed Appellant. She also testified that she felt pressured to have intercourse with Appellant and to permit him to ejaculate inside her. She testified that "[s]ometimes he forced" her to [let him] "finish inside. Like he would hold me down and like pressure me into it or use words" such as "[i]t would make us closer." N.T., 10/5/20, at 88. She also testified that, although he never physically forced her to have intercourse, she felt pressured because he told her that if she did not agree, Appellant "would leave or find someone else to do it[.]" *Id.* Ms. Bash testified that sometimes she would try to physically resist Appellant by squirming away during intercourse but Appellant would pin her down.

*Knight*, 290 A.3d 688 (unpublished memorandum at 6-7) (footnotes omitted; record citations modified). Ms. Bash testified that Appellant impregnated her when she was 16 years old, and she later "gave the baby up for adoption[.]" N.T., 10/5/20, at 89-90; *see also id.* at 90 (Ms. Bash testifying that Appellant proposed marriage to her and she said yes).

Appellant called R.K.'s mother, M.K., to testify as a defense witness. M.K. testified that, during the relevant period, she was separated from R.K.'s father. N.T., 10/6/20, at 49. M.K. and R.K. lived with M.K.'s 92-year-old father, and M.K. worked the night shift at a health care facility. *Id.* at 50.

During this period, M.K. frequently took R.K. to Skateaway. *Id.* at 51-53. M.K. confirmed that she met Appellant there, and that she trusted Appellant to drive R.K. home from Skateaway occasionally, when M.K. had to

go to work. *Id.* at 52-53; *see also id.* at 55 (M.K. testifying that she was not concerned about R.K.'s safety with Appellant "[b]ecause [M.K.] trusted they were just friends."). M.K. also testified that she was aware that R.K. went to a haunted house with Appellant and two of R.K.'s other friends. *Id.* at 56. However, M.K. testified that Appellant took R.K. on the overnight trip to New York without M.K.'s awareness or permission, and asserted Appellant lied to R.K. by telling her he had obtained M.K.'s permission. *Id.* at 54, 60-61. M.K. further testified that Appellant lied to her about his age, telling M.K. he was in his early twenties when he was, in fact, 28 years old. *Id.* at 59. M.K. testified that she no longer trusted Appellant to be around R.K. "[b]ecause he raped her." *Id.* at 60.

Testifying in his own defense, Appellant stated that, during the relevant period, he was an avid roller skater and went to Skateaway frequently. *Id.* at 66-67. He indicated he knew the owners of Skateaway, and sometimes helped out by cleaning up or acting as a floor guard. *Id.* at 67; *see also id.* at 86 (Appellant describing a floor guard as "somebody that enforces the rules, such as no cell phones on the floor," etc.). Appellant testified he first met R.K. at Skateaway when he saw her crying and asked her if she was hurt. *Id.* at 68. Appellant testified he also met M.K. at Skateaway, and that M.K. agreed Appellant could drive R.K. home, which he began to do on a regular basis. *Id.* at 69-70. Appellant stated that M.K. "looked fatigued" and "seemed

appreciative" of his "offer[] to take [R.K.] home should [M.K.] feel tired getting ready for work." *Id.*[4]

Appellant agreed that he and R.K. attended a haunted house together with R.K.'s friends. *Id.* at 70. Appellant testified that the night ended "[u]neventful[ly.]" *Id.* at 71. Appellant stated he "took [R.K.] home and made sure she was okay with the night, checked in with the mother and grandfather and went about my business." *Id.*

Appellant further testified that he and R.K. took an overnight trip to Albany, New York, to visit a skating rink that "is in the Guinness Book of World Records[.]" *Id.* Asked if R.K. had permission to go on the trip, Appellant answered, "To my knowledge, yes." *Id.* Appellant testified he and R.K. stayed overnight at a hotel and returned home in his vehicle the next day. *Id.* at 71-72.

_____

[4] On cross-examination, Appellant initially denied that he offered to give R.K. rides in order to "g[e]t [M.K.] out of the picture" so he could be alone with R.K. N.T., 10/6/20, at 80. Upon further questioning, Appellant agreed that he was alone with R.K. when he gave her rides, and the following exchange ensued:

Q: So by getting [M.K.] out of the picture you got to spend a little time with [R.K.]?

A: Yes.

Q: And you did it under the guise of helping out a tired, old single mom who works midnights?

A: Yes.

*Id.* at 81.

Appellant testified that, during this time period, he was employed as a commercial truck driver and hauled candy for a candy company. *Id.* at 72. Appellant stated that he then obtained "a more lucrative position" in the oil and gas industry, "[h]auling frack sand for frack sites." *Id.* at 72-73. Appellant testified that his new job involved a hectic work schedule, and he agreed that "in and around late November 2017," he had less time to spend with family and friends, including R.K. *Id.* at 72, 74. Appellant confirmed that around "the third week of November" he "pretty much ceased [his] interactions with [R.K.,]" because he did nothing but "work, eat, sleep, get up and do it all over again." *Id.* at 74. Appellant testified that his lack of contact with R.K. caused a problem for her. *Id.* at 76-77. Appellant stated he had no further contact with R.K. after she called one of his friends in the middle of the night in early December 2017.[5] *Id.* at 88.

_____

[5] R.K. testified that Appellant yelled at her and then blocked her number, and this increased her fear that he would hurt her. N.T., 10/5/20, at 55-56; *see also id.* at 56 (R.K. testifying that "[t]his was pretty much the peak fear."). R.K. called Appellant's friend, Steven Ashworth (Mr. Ashworth), whom she had previously met. *Id.* R.K. testified that she never mentioned the sexual assault to Mr. Ashworth, but that he "knew of the relationship-type thing that was going on [between R.K. and Appellant,] where it was an intimate relationship. He knew this." *Id.* at 56, 78. R.K. testified that in the phone call, she told Mr. Ashworth she and Appellant "were having difficulties in our friendship-type thing," and expressed her fears. *Id.* at 57, 58. According to R.K., Mr. Ashworth said, "You know you can never go to law enforcement about this," and that if R.K. "told anybody about what [she and Appellant] were doing[, Appellant] could get in a very large amount of trouble." *Id.* at 58.

*(Footnote Continued Next Page)*

Appellant testified that, in connection with his job as a commercial truck driver, he kept a "go bag" in his personal vehicle, which he described as "just a bag of clothing, toiletries, a couple of snacks, things like that." *Id.* at 73; *see also id.* (Appellant explaining that he kept the bag because, as a truck driver, "you never know what's going to happen," such as getting stuck in a snowstorm). Appellant confirmed the bag was in his vehicle during his trip to New York with R.K. *Id.* at 74.

Appellant denied that he ever made sexual advances toward R.K., or ever sexually assaulted her. *Id.* at 74-75. He expressly denied that he ever

---

Mr. Ashworth testified as a defense witness. He indicated that R.K. texted him at 3:00 a.m. on December 1, 2017, while he was working a shift as a truck driver, and asked if they could talk. N.T., 10/6/20, at 91. He suggested that R.K. call him because he could not text while driving, and they proceeded to have a three-hour phone conversation throughout Mr. Ashworth's three-hour drive. *Id.* at 91-92. Mr. Ashworth stated they spent only "the first 15 minutes" discussing Appellant, and the rest of the time talking about "anything and everything." *Id.* at 92-93. Mr. Ashworth testified R.K. was trying to reach Appellant and asked if Mr. Ashworth could call Appellant for her. *Id.* at 92. Mr. Ashworth testified R.K. never mentioned any sexual abuse, sexual advances, or negative treatment by Appellant, "[o]ther than the fact that she thought maybe he was ignoring her because she could not reach him." *Id.* at 93-94. Mr. Ashworth denied having knowledge of any sexual contact between R.K. and Appellant, and denied that he ever advised R.K. not to go to the authorities about anything. *Id.* at 94, 99. On cross-examination, Mr. Ashworth testified that he saw nothing inappropriate about having a three-hour conversation with a 16-year-old girl in the middle of the night, and stated he would see no problem with his own daughter having similar contact with a 47-year-old man. *Id.* at 97; *see also id.* at 90, 95 (at the time of the phone call, Mr. Ashworth was 47 and married with four children).

- 14 -

kissed R.K., touched her breast or vaginal area, performed oral sex on her, or had intercourse with her. *Id.* at 75-76.

Appellant did not discuss the semen-stained towel in his direct testimony. On cross-examination, the following exchange occurred:

Q: So this is [a] giant big mystery as to how your semen ended up on a towel at [R.K.'s] house; is that correct?

A: It appears so.

Q: What's your explanation for that?

A: Always having that [] go bag that could have been a sample out of my truck. I have taken people with me in my truck and I have personal relations outside that.

Q: So you are accusing [R.K.] of taking a towel out of your [] go bag in which you ejaculated on?

A: No, I said it's a possibility.

Q: Well, what other possibility is there, sir? … It was a towel from [R.K.'s] house, wasn't it?

A: I can't identify that.

Q: Okay. Well [R.K.] did?

A: Could have been my towel, ma'am.

*Id.* at 77-78.

Appellant agreed that he gave R.K. a Fender Stratocaster guitar by leaving it on her porch. *Id.* at 77. He testified the guitar's retail value was $2,000, but that he got it for $800. *Id.* at 84. Appellant maintained he "give[s] a lot of things away," and once gave "$1,500 worth of skates to somebody else's grandchildren." *Id.* at 84-85.

Appellant admitted he began a sexual relationship with Ms. Bash when she was 16, and impregnated Ms. Bash with a child that was later given up for adoption. *Id.* at 82-84; *see also id.* at 83 (Appellant agreeing that he asked Ms. Bash to marry him). Appellant testified that Ms. Bash was 17 when she became pregnant. *Id.* at 83-84. Appellant denied telling Ms. Bash he did not want to use condoms, and testified her pregnancy resulted from a broken condom. *Id.* at 83.

At the trial's conclusion, the jury convicted Appellant of all charges. On January 12, 2021, the trial court imposed an aggregate sentence of 7 to 14 years' imprisonment.

Appellant filed a direct appeal. On December 19, 2022, we affirmed Appellant's judgment of sentence. *Knight*, 290 A.3d 688 (unpublished memorandum). Appellant did not seek allowance of appeal in the Pennsylvania Supreme Court.

On August 24, 2023, acting *pro se*, Appellant timely filed the instant PCRA petition, his first. The PCRA court appointed PCRA counsel, who filed an amended petition on March 5, 2024. The amended petition averred that trial counsel rendered ineffective assistance by, *inter alia*, failing to object to Nurse Friedman's testimony, specifically her opinion of sexual assault by history. On August 7, 2024, the PCRA court held an evidentiary hearing, at which trial counsel and Appellant testified. On March 31, 2025, the PCRA court filed an opinion and order dismissing the petition.

Appellant timely appealed. Appellant and the PCRA court have complied with Pa.R.A.P. 1925. Appellant presents a single issue for our review:

Whether the PCRA court[ erred or abused its discretion when it denied Appellant's] claim that trial counsel provided ineffective assistance for failing to object or otherwise challenge [Nurse Friedman's] testimony and opinion of sexual abuse based on history when there were no physical findings of abuse[,] since [that testimony and opinion] impermissibly bolstered [R.K.'s] testimony and was an encroachment upon the province of the jury …?

Appellant's Brief at 2.

When reviewing the denial of a PCRA petition, we examine "whether the PCRA court's conclusions are supported by the record and free from legal error." *Commonwealth v. Johnson*, 289 A.3d 959, 979 (Pa. 2023) (citation omitted).

The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding. In contrast, we review the PCRA court's legal conclusions *de novo*.

*Commonwealth v. Maxwell*, 232 A.3d 739, 744 (Pa. Super. 2020) (*en banc*) (citations omitted). A PCRA petitioner "has the burden of persuading [an appellate c]ourt that the PCRA court erred and that such error requires relief." *Commonwealth v. Montalvo*, 205 A.3d 274, 286 (Pa. 2019); *see also Commonwealth v. Sandusky*, 324 A.3d 551, 564 (Pa. Super. 2024) ("We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party.").

Appellant challenges trial counsel's effectiveness. A PCRA petitioner claiming ineffective assistance of counsel

> will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."

*Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009) (quoting 42 Pa.C.S.A. § 9543(a)(2)(ii)). "[C]ounsel is presumed to be effective, and the petitioner bears the burden of proving to the contrary." *Commonwealth v. Brown*, 196 A.3d 130, 150 (Pa. 2018). "As a general and practical matter, it is more difficult for a defendant to prevail on a claim litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error." *Commonwealth v. Charleston*, 94 A.3d 1012, 1019 (Pa. Super. 2014) (citing *Commonwealth v. Gribble*, 863 A.2d 455, 472 (Pa. 2004)).

To overcome the presumption of counsel's effectiveness, a PCRA petitioner must plead and prove each of the following three prongs:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. *Commonwealth v. Chmiel*, 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from *Commonwealth v. Pierce*, 527 A.2d 973, 975-76 (Pa. 1987)). … Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015) (citations modified). "We need not analyze the prongs of an ineffectiveness claim in any

particular order.   Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case." *Commonwealth v. Evans*, 303 A.3d 175, 182 (Pa. Super. 2023)).

> If a petitioner fails to prove any … prong[] [of the ineffectiveness test], his claim fails.   Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests.   Where matters of strategy and tactics are concerned, a finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.   To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.   A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

*Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014) (citations, quotation marks, and brackets omitted).

Instantly, Appellant argues trial counsel rendered ineffective assistance by failing to object to Nurse Friedman's testimony describing her opinion regarding R.K. as "[s]exual assault by [R.K.'s] history."   Appellant's Brief at 19 (quoting N.T., 10/5/20, at 111).   Appellant asserts this testimony was inadmissible under *Commonwealth v. Maconeghy*, 171 A.3d 707 (Pa. 2017), in which our Supreme Court held that "an expert witness may not express an opinion that a particular complainant was a victim of sexual assault based upon witness accounts couched as a history, at least in the absence of physical evidence of abuse." *Maconeghy*, 171 A.3d at 712.   Appellant argues

- 19 -

that "Nurse Friedman's examination of [R.K.] was normal and [Nurse Friedman] found no evidence of any physical abuse. Her opinion was solely based on the history that [R.K.] provided to her." Appellant's Brief at 20. Appellant asserts "[t]his is the specific type of testimony that the [*Maconeghy*] Court stated was prohibited." *Id.* Appellant argues trial counsel had no reasonable basis for not objecting to Nurse Friedman's opinion of "sexual assault by [R.K.'s] history." *Id.* at 21. Appellant further maintains that he suffered prejudice from the improper opinion testimony, arguing the trial outcome would have been different had the testimony been excluded. *Id.* at 26.

The Commonwealth counters that *Maconeghy* is distinguishable, and that the instant case is "more akin" to *Commonwealth v. Minerd*, 753 A.2d 225 (Pa. 2000). Commonwealth Brief at 24. In *Minerd*, our Supreme Court held that an expert witness did not improperly bolster the child victims' credibility, where the expert testified that "the absence of physical trauma [found in the expert's exam] did not prove that the [sexual] abuse never occurred." *Minerd*, 753 A.2d at 228. The Commonwealth maintains that, "like [the expert] in *Minerd*, [Nurse Friedman] was neither asked for, nor did she express, any opinion as to whether R.K. was telling the truth about being sexually abused." Commonwealth Brief at 24. The Commonwealth further maintains that, like the expert in *Minerd*, Nurse Friedman agreed that her physical exam "was inconclusive as to whether any abuse occurred." *Id.*

- 20 -

Finally, the Commonwealth argues Appellant failed to establish prejudice, asserting "there is not a reasonable probability that the outcome of the trial would have been different" had Nurse Friedman's opinion of sexual abuse by R.K.'s history "been objected to and excluded" from evidence. *Id.* at 27.

As our Supreme Court has explained,

[e]xpert testimony generally is admissible to aid the jury when the subject matter is distinctly related to a science, skill or occupation which is beyond the knowledge or experience of an average lay person. ***Commonwealth v. Counterman***, 553 Pa. 370, 719 A.2d 284, 302-03 (citing ***Commonwealth v. O'Searo***, 466 Pa. 224, 352 A.2d 30, 33 (1976)), ***cert. denied***, [528] U.S. [836], 120 S.[ ]Ct. 97, 145 L.Ed.2d 82 (1999). Conversely, expert testimony is not admissible where the issue involves a matter of common knowledge. ***Id.*** at 303. In assessing the credibility of a witness, jurors must rely on their ordinary experiences of life, common knowledge of the tendencies of human behavior, and observations of the witness'[s] character and demeanor. ***Id.*** **Because the truthfulness of a witness is solely within the province of the jury, expert testimony cannot be used to bolster the credibility of witnesses**. ***See id.***

***Minerd***, 753 A.2d at 230 (emphasis added).

Expert testimony in sexual abuse cases is governed by 42 Pa.C.S.A. § 5920(b), which provides, in pertinent part:

**(b) Qualifications and use of experts.--**

(1) In a criminal proceeding subject to this section, [including, *inter alia*, sexual offenses,] a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences or victim services issues, related to sexual violence or domestic violence, that will assist the trier of fact in understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence

- 21 -

and the impact of sexual violence or domestic violence on victims during and after being assaulted.

(2) If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors.

(3) **The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.**

42 Pa.C.S.A. § 5920(b)(1)-(3) (emphasis added).

As the parties rely heavily on *Minerd* and *Maconeghy*, we examine those decisions in some detail.

In *Minerd*, two child victims disclosed that they had been sexually abused several years earlier by their then-stepfather. *Minerd*, 753 A.2d at 227-28. Dr. Margaret Carver (Dr. Carver), "a qualified expert in obstetrics and gynecology," physically examined the victims following their disclosure. *Id.* at 228. At trial,

> Dr. Carver testified that she found no evidence of physical trauma to the girls' genital or anal areas. According to Dr. Carver, the absence of physical trauma did not prove that the abuse had never occurred. She explained that because of the nature of the muscle that closes the anus, there would have been an adequate time between when the abuse occurred and the examination for any damage that had been done to heal. On cross-examination, Dr. Carver confirmed that she was not stating that the alleged acts did or did not occur, and agreed that … it could be that "there was no trauma to the anus or genitals because the acts in fact did not occur." Dr. Carver stated that "either way, there was no evidence of it."

*Id.* (record citations omitted).

On appeal, the defendant argued Dr. Carver's testimony was inadmissible "because it improperly bolster[ed] the victim[s'] credibility, and

- 22 -

as such, the prejudicial impact of the testimony outweigh[ed] its probative

value." *Id.* at 230. The *Minerd* Court disagreed:

> In this case, Dr. Carver's testimony was probative of the veracity of the children. *See* [*Commonwealth v.*] *Hawk*, 709 A.2d [373,] 377 [(Pa. 1998)] (negative rape kit test results were probative of defendant's claim of innocence). However, Dr. Carver was neither asked for, nor did she express, any opinion as to whether the children were telling the truth about being sexually abused. Her testimony only explained the significance of the results of the physical examination. *See* [*Commonwealth v.*] *Johnson*, 690 A.2d [274,] 277 [(Pa. Super. 1997) (*en banc*)]. Moreover, Dr. Carver's testimony regarding her physical findings was inconclusive as to whether any abuse had even occurred. Thus, we do not agree that the expert impermissibly bolstered the children's credibility.

*Minerd*, 753 A.2d at 230.

The defendant also claimed that "the jury may have been unduly

impressed by the expert's testimony," asserting "the jury essentially [was]

asked to conclude that the assaults occurred because the expert stated that

there was no physical evidence to prove the assaults, thereby allowing the

Commonwealth to prove its case through 'non-evidence.'" *Id.* at 232. The

*Minerd* Court rejected this claim, stating:

> Dr. Carver did not offer only one biased view of the physical evidence; to the contrary, defense counsel elicited an explanation which was equally favorable to [the defendant]. Moreover, the trial judge clearly advised the jury that they were not bound to accept the expert's testimony merely because she possessed special skill or knowledge. The law presumes that the jury follows the court's instructions. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 726-27, *cert. denied*, 528 U.S. 827, 120 S.[ ]Ct. 78, 145 L.Ed.2d 66 (1999). We fail to see how the jury could have been unduly influenced under these circumstances.

*Minerd*, 753 A.2d at 232 (record citation omitted).

In **Maconeghy**, a 16-year-old victim disclosed that she had been raped by her stepfather when she was 11 years old. **Maconeghy**, 171 A.3d at 708. At trial, the Commonwealth

adduced testimony from Quentin Thomas Novinger, M.D. [(Dr. Novinger)], a pediatrician who had evaluated [the victim] to determine whether she had suffered from sexual abuse. On direct examination, Dr. Novinger explained that he regularly rendered consultative services on behalf of the Children's Advocacy Center for Northeastern Pennsylvania, and, in this capacity, he had been engaged to evaluate [the victim]. He indicated that he observed a forensic interview of [the victim] and collected and reviewed other historical information, then he conducted a physical examination. Although Dr. Novinger found no evidence of abuse in the physical exam, he opined that, outside the first seventy-two hours after the occurrence of a sexual assault, such an examination is unlikely to detect evidence of the abuse. Thus, according to the pediatrician, the fact of abuse can be determined "[r]eally by history only."

On cross-examination, the defense repeatedly attempted to secure a concession that the medical evidence did not support a determination of abuse, to which Dr. Novinger replied: "The history she provided to me pretty clearly indicated that she was sexually abused." [Dr. Novinger further stated:] "Clearly the medical encounter[, including the history,] indicated the child had been victimized."[] On redirect, the district attorney posed a series of questions directed toward highlighting that a physical examination is not conclusive, culminating in the following interchange:

> [Prosecutor]: And when you're saying that your examination is normal, you're not saying that nothing happened, are you?
>
> [Dr. Novinger]: That's correct. I really believe strongly that was my medical conclusion that this child was victimized.

**Id.** at 708-09 (record citations omitted).

On appeal, our Supreme Court held

- 24 -

that an expert witness may not express an opinion that a particular complainant was a victim of sexual assault based upon witness accounts couched as a history, at least in the absence of physical evidence of abuse. We find that such testimony intrudes into the province of the jury relative to determining credibility. Such conclusion is consistent with a wide body of decisions in other jurisdictions. *See, e.g., United States v. Charley*, 189 F.3d 1251, 1267 n.23 (10th Cir. 1999) (collecting cases); *State v. Buchholtz*, 841 N.W.2d 449, 459 (S.D. 2013) (same).

*Maconeghy*, 171 A.3d at 712; *see also id.* at 715 (concluding "that expert testimony opining that a child has been sexually abused—which is predicated on witness accounts and not physical findings—is inadmissible.").

The *Maconeghy* Court set forth the following analysis:

The decision in *State v. Iban C.*, 275 Conn. 624, 881 A.2d 1005 (2005), is illustrative and is essentially on all fours with the issue presented in this case. There, a pediatrician testified in a child sexual assault case that the complainant manifested no physical signs of abuse; the physician nevertheless rendered a diagnosis of abuse based both upon the physical examination and the complainant's history developed by an investigative team. *See id.* at 1013-14. The Connecticut Supreme Court held that the trial court had abused its discretion in admitting such testimony, because the pediatrician's opinion was inextricably tied to her belief in the complainant's veracity. In this regard, the court reasoned:

[B]y [the pediatrician's] own admission, her diagnosis depended on a belief in this same credibility [that was central to the jurors' determination] because her ultimate assessment was based almost entirely on the history provided by the victim and the victim's mother to the investigation team. [The pediatrician's] diagnosis of child sexual abuse, therefore, necessarily endorsed the victim's credibility, and functioned as an opinion as to whether the victim's claims were truthful.

*Id.* at 1015. Additionally, the Connecticut court determined that the opinion evidence "was not helpful to the jury in deciding the

- 25 -

precise question on which it had to pass." *Id.* at 1016-17. The court proceeded to distinguish the circumstances from cases in which expert testimony concerning the general characteristics of sexual assault victims had been permitted, *i.e.*, testimony that did not specifically link those characteristics to the complainant. *See id.* at 1015.

Other courts have variously characterized expert opinions that children have been sexually assaulted in the absence of physical evidence as "putting a certificate of veracity on the child's testimony," *Buchholtz*, 841 N.W.2d at 459; "bolstering credibility,["] *id.* at 458; "merely vouching," *Charley*, 189 F.3d at 1267; and "indirect vouching," [*State v.*] *Favoccia*, 51 A.3d [1002,] 1025 [(Conn. 2012)]. *See generally Buchholtz*, 841 N.W.2d at 458 & n.4 (collecting cases for the proposition that "[m]ost jurisdictions restrict this type of expert testimony, raising concerns about improper bolstering of credibility and invading the province of the jury on determining an ultimate issue"). We are in full agreement with the assessment of these courts in the relevant regard. Consistent with the Connecticut jurisprudence, we find no material distinction between direct vouching (*e.g.*, "I believe the complainant is telling the truth") and indirect vouching (*e.g.*, "I conclude that the complainant was sexually assaulted based upon the history she related.").

Most courts also recognize the high stakes involved in child sexual assault cases and the potential power and persuasiveness of testimony by those clothed with the mantle of professional expertise. *See, e.g.,* [*People v.*] *Peterson*, 537 N.W.2d [857,] 868 [(Mich. 1995)] (reflecting the Michigan Supreme Court's appreciation that the risks associated with expert vouching in child sexual assault cases are exacerbated by "the nature of the offense and the terrible consequences of a miscalculation" given that, "[t]o a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat" (quoting *People v. Beckley*, 434 Mich. 691, 456 N.W.2d 391, 404 (1990) (plurality))). Accordingly, the courts have attempted to devise appropriate and necessary limitations, albeit differing in various respects concerning the appropriate balance to be stricken.

*Maconeghy*, 171 A.3d at 712-13 (footnotes omitted).

The *Maconeghy* Court distinguished *Minerd*, stating that

the evidence in *Minerd* fell within the class of generalized evidence about victims of sexual assault that is more widely approved in the courts and was focused on a physical examination; indeed, the Court specifically noted that the expert witness "confirmed that she was not stating that the alleged acts did or did not occur" relative to the complainant.

*Id.* at 715 (quoting *Minerd*, 753 A.2d at 228).

Pertinently, this Court has previously applied *Minerd* and *Maconeghy* in non-precedential decisions[6] involving challenges to Nurse Friedman's testimony, in unrelated child sexual assault cases, regarding her opinion of "sexual assault by history."

In *Commonwealth v. Wildoner*, 981 MDA 2018, 2019 WL 2447057 (Pa. Super. June 11, 2019) (unpublished memorandum), *appeal denied*, 222 A.3d 378 (Pa. 2019), the defendant argued on direct appeal that the trial court abused its discretion in admitting Nurse Friedman's testimony regarding "sexual assault by history," where her "physical examination of [the victim] revealed no evidence of sexual assault." *Id.* at *3.  Relying on *Maconeghy*, the defendant claimed the testimony improperly bolstered the victim's credibility.  *Id.*  This Court disagreed:

[Nurse] Friedman provided a diagnosis for [the 14-year-old victim, K.H.,] following an interview and physical exam of "sexual assault by history."  Neither [Nurse] Friedman's testimony nor her report, however, precisely explains the meaning of this diagnosis.

---

[6] Pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for persuasive value.

At trial, [Nurse] Friedman explained the following with respect to her diagnosis:

> I take into account everything that has happened that evening—the interview, the forensic interview, that has taken place, as well as my discussion with [K.H.], obtaining her medical history and her concerns, as well as the treatment I provided that evening and the recommendation for further treatment after she leaves.

> **Thus, from what we can discern from [Nurse] Friedman's testimony, the diagnosis of "sexual assault by history" represents nothing more than an expression that K.H. relayed that she was sexually assaulted, and [Nurse] Friedman provided and recommended corresponding treatment**. Unlike the expert in *Maconeghy*, at no point during her testimony did [Nurse] Friedman express, either implicitly or explicitly, any kind of opinion or belief that K.H. was sexually assaulted. Like the expert in *Minerd*, the Commonwealth did not ask [Nurse] Friedman to express such an opinion. Indeed, on cross-examination, when defense counsel asked [Nurse] Friedman if it was "possible that there were no injuries [discovered during the physical examination of K.H.] because nothing happened in the first place[,]" [Nurse] Friedman responded in the affirmative. Therefore, [Nurse] Friedman's testimony more closely resembles that of the expert in *Minerd*. Consequently, we conclude that the trial court did not abuse its discretion in declining to exclude testimony relating to Friedman's diagnosis of "sexual assault by history."

*Id.* at *4 (record citations omitted; emphasis added).

In *Commonwealth v. Sansone* (*Sansone I*), 329 A.3d 604, 2024 WL 4432799 (Pa. Super. Oct. 7, 2024) (unpublished memorandum), *vacated and remanded by* 335 A.3d 303 (Pa. 2025), this Court affirmed the PCRA court's denial of PCRA relief, where the defendant argued his counsel "was ineffective for failing to object to [Nurse Friedman's] testimony regarding her

diagnosis of sexual abuse by history." ***Id.*** at *1. This Court expressed its agreement with the PCRA court's following analysis:

> Here, similar to ***Minerd***, [Nurse] Friedman … did not impermissibly bolster the victim's credibility. [Nurse Friedman], following an interview and physical exam[,] diagnosed the victim with "sexual assault by history." … At trial, the nurse explained … that her diagnosis was based on what the victim relayed to her.
>
> Unlike ***Maconeghy***, [Nurse Friedman] was neither asked for, nor did she express, any opinion as to whether the victim was telling the truth about being sexually abused. Regarding the physical examination, [Nurse Friedman's] testimony was inconclusive as to whether any abuse had occurred, agreeing with [defense] counsel that a "normal physical exam does not rule out the possibility of sexual assault[,] … a normal exam also means that possibly sexual assault didn't happen," and "we don't know based on the physical exam whether it happened or didn't happen in this case." [Nurse Friedman's] testimony only explained the significance of the results of the physical examination, stating multiple times that the victim's exam came back normal.

***Id.*** at *3 (quoting PCRA Court Opinion, 6/28/23, at 3-5) (record citations omitted).

> The ***Sansone I*** Court further
>
> stress[ed] that, on cross-examination, defense counsel thoroughly questioned Nurse Friedman about the 8-year-old victim's complete lack of physical injury despite her report that [the defendant], a 230-pound adult, had raped her. Counsel expressly asked [Nurse Friedman]:
>
> > Q: So if I understand you correctly, you're saying that the normal physical exam does not rule out the possibility of sexual assault?
> >
> > A: Yes.
> >
> > Q: Is the opposite true though[,] that a normal exam also means that possibly sexual assault didn't happen?

A: Yes.

Q: So we don't know based on the physical exam whether it happened or didn't happen in this case?

A: In this case, correct.

Q: Right. So 50 percent it could have happened, 50 percent it didn't happen?

A: Well, I look back at my history that I've obtain[ed] and I look to see if it's … clear and consistent. So my diagnosis is based on the history presented.

Additionally, although Nurse Friedman stated that listening for clear and consistent information aids in her diagnosis, as noted by the [PCRA] court, at no point did the nurse say the victim was telling the truth. Therefore, the jury was made aware that there was no physical evidence of sexual assault, that Nurse Friedman's diagnosis was based on the victim's history alone, but that, based on the lack of any physical evidence, it was just as likely that a sexual assault had not occurred. The nurse never said it was her medical opinion that a sexual assault definitely occurred. Hence, she did not improperly bolster the victim's testimony in the absence of physical evidence[,] and the jury was free to exercise its role of weighing all evidence before it.

*Id.* at *3-4 (record citations omitted).

The *Sansone I* Court concluded that

the concerns raised by *Maconeghy*, decided in 2017, were not present here. Instead, *Minerd*, decided 17 years earlier, was more akin to these circumstances. [Therefore], we conclude the PCRA court properly found there is no underlying merit to the claim that [defense] counsel was ineffective for failing to object to [Nurse Friedman's] testimony as improperly bolstering that of the victim on the basis of *Maconeghy*.

*Id.* at *4.

Following **Sansone I**, the defendant sought allowance of appeal to our Supreme Court. The Supreme Court granted allowance of appeal and vacated the **Sansone I** decision in the following order:

AND NOW, this 18th day of March, 2025, Petition for Allowance of Appeal is GRANTED. Further, the decision of the Superior Court is VACATED and the case is REMANDED for the Superior Court to reassess Petitioner's ineffectiveness claim. **See Commonwealth v. Maconeghy**, 642 Pa. 770, 171 A.3d 707, 713, 715 (2017) (holding "that expert testimony opining that a child has been sexually abused–which is predicated on witness accounts and not physical findings–is inadmissible" and acknowledging "no material distinction between direct vouching (*e.g.*, 'I believe the complainant is telling the truth') and indirect vouching (*e.g.*, 'I conclude that the complainant was sexually assaulted based upon the history she related.'")).

**Commonwealth v. Sansone**, 335 A.3d 303 (Pa. 2025).

On remand, in a non-precedential decision, this Court granted PCRA relief and awarded the defendant a new trial, reasoning as follows:

Pursuant to [**Maconeghy**], and in light of the undisputed fact that [Nurse Friedman] relied on "sexual assault by history," not on physical findings, for her diagnosis that the victim in this matter was sexually assaulted, we conclude [the defendant's] claim has merit. [Defense] counsel should have objected to [Nurse Friedman's] testimony that the victim was sexually abused based only on the history the victim related to her. In fact, counsel admitted as much at the PCRA hearing.

We also conclude that the second prong of the ineffectiveness test, lack of a reasonable basis, has been met. At the PCRA hearing, trial counsel could not adequately explain why he did not object, offering only that he might have been focused on the fact that there was no physical evidence.

Finally, again based on **Maconeghy**, we are constrained to conclude [the defendant] was prejudiced by counsel's failure to object to this inadmissible testimony. **See Maconeghy**, 171 A.3d at 775-76 (noting, "[g]iven its determination that the [expert's]

- 31 -

testimony was inadmissible, … the [Superior Court] panel concluded that it was constrained to award a new trial" because the expert's testimony he believed child was victimized based only on her report to him where physical evidence was inconclusive would cause jury to defer to expert rather than assess victim's credibility on its own) (citation omitted); *see also Commonwealth v. Maconeghy*, 2015 WL 7078462, unpublished memorandum, at *5 (Pa. Super. June 12, 2015).

*Commonwealth v. Sansone* (*Sansone II*), 341 A.3d 84, 2025 WL 1330497, *2 (Pa. Super. May 7, 2025) (unpublished memorandum).

Instantly, Appellant argues his case "is identical to *Sansone*," and urges us to adopt *Sansone II*'s reasoning. Appellant's Brief at 29; *see also id.* at 21-23, 24-25. The Commonwealth counters that *Sansone II* is non-precedential and non-binding, and further asserts it is unpersuasive. Commonwealth Brief at 18. Rather, the Commonwealth maintains this Court "had it right the first time" in *Sansone I*, and argues we should be persuaded by *Sansone I*'s reasoning, even though the Supreme Court vacated that decision. *Id.*; *see also id.* at 18-22. The Commonwealth further maintains *Wildoner* is analogous and persuasive. *Id.* at 22-23.

Here, the PCRA court determined Appellant's underlying claim that Nurse Friedman's opinion was inadmissible lacked arguable merit. PCRA Court Opinion, 3/31/25, at 15. Relying heavily on the reasoning of *Sansone I*,[7] the

___

[7] Though filed thirteen days after the Supreme Court entered its order in *Sansone*, the PCRA court's opinion does not evince an awareness that *Sansone I* had been vacated. *See generally*, PCRA Court Opinion, 3/31/25. The *Sansone II* decision (filed May 7, 2025) had not yet been issued.

PCRA court opined that Nurse Friedman's testimony in the instant case was akin to **Minerd** and did not run afoul of **Maconeghy**. **See id.** at 12-15 (discussing **Sansone I**); **see also id.** at 12, 13-14 (citing **Wildoner**, **supra**).

Our review discloses Nurse Friedman's testimony shares many similarities with Dr. Carver's testimony in **Minerd**. Nurse Friedman testified that her genital exam of R.K. revealed no physical trauma, but that she would expect any trauma to have healed due to the length of time since the alleged assault. N.T., 10/5/20, at 107-10; **see also Minerd**, 753 A.2d at 228 ("Dr. Carver testified that she found no evidence of physical trauma," but "explained that … there would have been an adequate time between when the abuse occurred and the examination for any damage that had been done to heal."). Nurse Friedman also testified that the lack of physical trauma did not mean the alleged assault did not occur. N.T., 10/5/20, at 113; **see also Minerd**, 753 A.2d at 228 ("According to Dr. Carver, the absence of physical trauma did not prove that the abuse had never occurred."). On cross-examination, Nurse Friedman agreed with trial counsel that she "can't tell if something did or did not [happen.]" N.T., 10/5/20, at 112; **see also Minerd**, 753 A.2d at 228 ("On cross-examination, Dr. Carver confirmed that she was not stating that the alleged acts did or did not occur, and agreed that … it could be that 'there was no trauma to the anus or genitals because the acts in fact did not occur.'"); **id.** at 230 ("Dr. Carver's testimony regarding her physical findings was inconclusive as to whether any abuse had even occurred."). Nurse

Friedman confirmed that her opinion of sexual assault by history was "based on [R.K.'s] statement" to her, N.T., 10/5/20, at 113, **but she "was neither asked for, nor did she express, any opinion" specifically as to whether R.K. was "telling the truth about being sexually abused."** *Minerd*, 753 A.2d at 230 (emphasis added).

However, while Dr. Carver's testimony "only explained the significance of the results of the physical examination," *id.* at 230, Nurse Friedman ventured beyond explaining the significance of her physical exam when, at the conclusion of her testimony on direct examination, she offered the opinion of "[s]exual assault by [R.K.'s] history." N.T., 10/5/20, at 111. That opinion— the specific testimony Appellant challenges—does not clearly fall within *Minerd*'s ambit.

Turning to *Maconeghy*, our review discloses the testimony of Nurse Friedman and Dr. Novinger share some similarities. Dr. Novinger "found no evidence of abuse in the physical exam," but "opined that, outside the first seventy-two hours after the occurrence of a sexual assault, such an examination is unlikely to detect evidence of the abuse." *Maconeghy*, 171 A.3d at 708. "Thus, according to [Dr. Novinger], the fact of abuse can be determined 'really by history only.'" *Id.* Though Nurse Friedman did not affirmatively state that abuse can be determined by history only, her testimony implied as much when she gave her opinion of sexual assault by

history, after conceding her exam revealed no physical findings. ***See*** N.T., 10/5/20, at 111.

However, Nurse Friedman's testimony stopped short of the opinion expressed by Dr. Novinger in significant respects. Dr. Novinger testified that "[t]he history [the victim] provided to me **pretty clearly indicated that she was sexually abused**." ***Maconeghy***, 171 A.3d at 708 (emphasis added). Dr. Novinger further stated, "**Clearly** the medical encounter[, including the history,] indicated the child had been **victimized**." ***Id.*** (brackets and bracketed language in original; emphasis added). Dr. Novinger's testimony "culminat[ed]" in his statement, "**<u>I really believe strongly</u> that was my medical conclusion that this child was victimized.**" ***Id.*** (emphasis added). Unlike Dr. Novinger, Nurse Friedman never directly commented on the quality of the history R.K. provided, nor did she state she **believed** in the history's veracity. Rather, Nurse Friedman explained her opinion of sexual assault by history as follows: "Because of what [R.K.] talked about during her forensic interview and because of what she talked about when we … talked together during the medical history, **she tells me a history of sexual assault**." ***Id.*** at 111 (emphasis added).

Given Nurse Friedman's use of language substantially more neutral than Dr. Novinger's, her testimony in this case could arguably bear the innocuous interpretation given to her similar testimony in ***Wildoner***:

> [F]rom what we can discern from [Nurse] Friedman's testimony, the diagnosis of "sexual assault by history" represents nothing

> more than an expression that [the victim] relayed that she was sexually assaulted, and [Nurse] Friedman provided and recommended corresponding treatment.

*Wildoner*, 2019 WL 2447057, \*4 (unpublished memorandum). However, we observe that, in the instant case, Nurse Friedman's opinion of "[s]exual assault by [R.K.'s] history" was presented as "an opinion within a reasonable degree of medical certainty as to the … medical findings relating to [R.K.]" N.T., 10/5/20, at 110-11; *see also id.* at 113 (Nurse Friedman describing sexual assault by history as "[m]y medical opinion.").[8] Regarding the admissibility of this testimony, we do not find *Wildoner*'s application of *Maconeghy* persuasive.

We reiterate *Maconeghy*'s holding that "an expert witness may not express an opinion that a particular complainant was a victim of sexual assault based upon witness accounts couched as a history, at least in the absence of physical evidence of abuse." *Maconeghy*, 171 A.3d at 712. The *Maconeghy* Court "f[ou]nd no material distinction between direct vouching (*e.g.*, 'I believe the complainant is telling the truth') and indirect vouching (*e.g.*, 'I conclude that the complainant was sexually assaulted based upon the history she related.')." *Id.* at 713. While Dr. Novinger's testimony in *Maconeghy*

_____

[8] It is unclear whether similar language was also used at trial in *Wildoner* or *Sansone*, as those decisions describe "sexual assault by history" as Nurse Friedman's "diagnosis" rather than her "opinion" or "medical opinion." *See Wildoner*, 2019 WL 2447057, \*4; *Sansone I*, 2024 WL 4432799, \*4; *Sansone II*, 2025 WL 1330497, \*2. For our present purposes, we discern no material difference between these terms.

- 36 -

resembles direct vouching, in our view, Nurse Friedman's instant testimony amounts to indirect vouching.

We acknowledge that Nurse Friedman's testimony was perhaps a shade less direct than **Maconeghy**'s example of indirect vouching, **id.**, and might sustain the innocuous interpretation **Wildoner** gave to similar testimony. In reaching its interpretation, however, the **Wildoner** Court remarked that "[n]either Nurse Friedman's testimony nor her report … precisely explains the meaning of [her] diagnosis" of sexual assault by history. **Wildoner**, 2019 WL 2447057, *4. We agree with **Wildoner** to the extent that, in both **Wildoner** and the instant case, Nurse Friedman never directly or explicitly stated what her opinion of sexual assault by history meant, beyond merely reflecting the fact that the victim relayed to her a history of sexual assault. But **Wildoner**'s analysis on this point suggests that Nurse Friedman's imprecision was a point in her favor when compared with Dr. Novinger's more direct vouching. We do not fully agree. While Nurse Friedman's imprecision may render her testimony less prejudicial than Dr. Novinger's,[9] it cuts against her on the more basic question of whether the opinion—regardless of its prejudicial value—aids the jury.

_____

[9] We discuss more fully below whether and to what extent Nurse Friedman's opinion testimony may have prejudiced Appellant.

Though Nurse Friedman may testify to the simple fact that R.K. relayed to her a history of sexual assault, we fail to see how presenting such information as a "medical opinion" or "diagnosis" aids the jury. In other words, if Nurse Friedman's opinion of sexual assault by history was nothing more than a confirmation that R.K. relayed a history of sexual assault to Nurse Friedman, then the language couching that information as "an opinion within a reasonable degree of medical certainty as to the … medical findings relating to [R.K.]," N.T., 10/5/20, at 110, was extraneous, and therefore "not helpful to the jury in deciding the precise question on which it had to pass." *Maconeghy*, 171 A.3d at 712 (quoting *Iban C.*, 881 A.2d at 1016-17). As such, the opinion was not admissible as expert testimony.

Because *Maconeghy* dealt with direct vouching, its views on indirect vouching could be considered *dicta*. *See Commonwealth v. Borrin*, 80 A.3d 1219, 1224 n.10 (Pa. 2013) ("In every case, what is actually decided is the law applicable to the particular facts; all other conclusions are but *obiter dicta*." (citation and brackets omitted)); *Commonwealth v. Jackson*, 111 A.3d 1187, 1190 (Pa. Super. 2015) (citing *Borrin* and stating *dicta* "is not binding"). In any event, we agree with the *Maconeghy* Court's reasoning on indirect vouching. *See Maconeghy*, 171 A.3d at 712-13. Though Nurse Friedman never stated that her opinion of sexual assault by history involved

her assessment of R.K.'s credibility,[10] her opinion ran the risk, to a minor degree, of "putting a certificate of veracity on the child's testimony," *id.* at 713 (quoting **Buchholtz**, 841 N.W.2d at 459), by a witness "clothed with the mantle of professional expertise." **Id.** Thus, though Nurse Friedman's testimony may be less problematic than Dr. Novinger's (and resemble in many respects Dr. Carver's admissible testimony in **Minerd**), it is nevertheless inadmissible under **Maconeghy**'s reasoning.

Based on the foregoing, we conclude that Appellant's underlying claim regarding the inadmissibility of Nurse Friedman's opinion testimony has

---

[10] Nurse Friedman's instant testimony avoided commentary on the quality of the victim's history more successfully than her testimony in **Sansone**, where she stated: "I look back at my history that I've obtain[ed,] and I look to see if it's … clear and consistent. So my diagnosis is based on the history presented." **Sansone I**, 2024 WL 4432799, *4.

arguable merit. Moreover, in light of the above analysis, trial counsel's proffered basis for not objecting to the testimony was unreasonable.[11, 12]

However, our inquiry does not end here. Appellant's ineffectiveness claim does not merit relief unless he can establish the third and final prong of the ineffectiveness test: prejudice. To establish prejudice, Appellant must

> prove **actual prejudice**, that is, a reasonable probability that, but for counsel's lapse, the result of the … proceeding would have been different. ***Strickland v. Washington***, 466 U.S. 668, 694

_____

[11] As the PCRA court observed, trial counsel testified at the PCRA evidentiary hearing

> that he did not object to [Nurse Friedman's] testimony, even given the … holding in ***Maconeghy***, because the defense was that there was no sexual contact with R.K., and the fact that there was no sexual trauma present [in the physical exam] helped the defense. [N.T., 8/7/24,] at 26-34. [Trial counsel] testified that he did not believe that [Nurse] Friedman's determination of sexual assault based on history bolstered the victim's testimony. ***Id.*** at 34. He testified that he was aware of [Nurse] Friedman's findings before the trial, and that she was going to testify that there were no physical findings of abuse, and that allowing her testimony was an agreed upon defense trial strategy. ***Id.*** at 44.

PCRA Court Opinion, 3/31/25, at 15. Trial counsel's rationale appears to presume that Nurse Friedman's opinion of sexual assault by history could not be excluded under ***Maconeghy***. Nurse Friedman's broader testimony regarding her physical findings was clearly admissible, and trial counsel's reasonable belief that this testimony helped the defense did not require him to also acquiesce to the admission of her opinion of sexual assault by history. Trial counsel did not assert that particular opinion helped the defense, and he articulated no reasonable basis for failing to lodge an objection.

[12] We observe that, in light of our determination below that Appellant failed to establish the prejudice prong of the ineffectiveness test, our consideration of the first two prongs is not strictly necessary to our disposition. However, as the admissibility of Nurse Friedman's opinion testimony is a close question, we deemed a thorough examination of its admissibility essential to our consideration of its prejudicial effect.

(1984). "In making this determination, a court hearing an ineffectiveness claim must consider the **totality of the evidence** before the judge or jury…. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695-96 (emphasis added). Ultimately, a reviewing court must question the reliability of the proceedings and ask whether "the result of the particular proceeding [was] unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696.

*Commonwealth v. Lesko*, 15 A.3d 345, 383 (Pa. 2011) (emphasis in original; citations modified); *see also Commonwealth v. Collins*, 957 A.2d 237, 244 (Pa. 2008) ("A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." (citing *Strickland*, 466 U.S. at 694)).

As our Supreme Court has observed,

the test for prejudice in the ineffectiveness context is more exacting than the test for harmless error, and the burden of proof is on the defendant, not the Commonwealth. … [The harmless error] standard … is a lesser standard than the *Pierce* prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel.

*Spotz*, 84 A.3d at 315 (citations and quotation marks omitted).

Instantly, Appellant asserts he was prejudiced "for the same reason" as the defendant in *Sansone*. Appellant's Brief at 24 (citing *Sansone II*, 2025 WL 1330497 at *2). Appellant argues trial counsel's failure to object to Nurse Friedman's opinion testimony "allowed the jury to hear an expert testify that [R.K.] was telling the truth about being sexually assaulted." *Id.* at 26.

- 41 -

Appellant maintains he was prejudiced because "[t]he outcome of the trial would have been different had the impermissible testimony from [Nurse Friedman] bolstering [R.K.'s] testimony … been omitted[,] as it should have been." *Id.* at 25.

Appellant argues "the evidence in this case was not overwhelming." *Id.* at 25. He notes that while R.K. testified Appellant sexually assaulted her, he denied the allegation, and there were no eyewitnesses to the alleged assault. *Id.* Appellant contends that "[s]ince credibility was significant, and perhaps the primary … factor in this case, had [Nurse Friedman's] opinion been properly excluded[,] there is a reasonable probability that the outcome would [have] be[en] different." *Id.* at 26-27.

Regarding the towel stained with his semen, Appellant notes that R.K. did not provide the towel to police until three months after the alleged incident. *Id.* at 25. Appellant argues R.K. "**claimed** she used the towel to clean herself after [Appellant] assaulted her," and "**testified** she saved it in order to bring it to law enforcement." *Id.* (emphasis added). Appellant asserts that he "denied ever having sexual encounters with" R.K., but "never denied he was with [R.K.] or that he was at her home, or even that he drove her in his vehicle." *Id.* at 26. Apart from what may be inferred from this lone assertion, Appellant's brief makes no attempt to discuss or defend the suggestion he made at trial, *i.e.*, that R.K. could have stolen the towel from

his bag.[13] Nevertheless, Appellant maintains that, "[e]ven with the towel, this case still came down to credibility." *Id.* at 26.

The Commonwealth counters that Appellant failed to demonstrate prejudice, highlighting evidence such as "the towel containing [Appellant's] DNA," Ms. Bash's testimony that Appellant had a sexual relationship with her "very similar to the one he had with R.K.," and "the expensive gifts [Appellant] gave R.K." Commonwealth Brief at 26-27. The Commonwealth argues that, in light of this evidence, "there is not a reasonable probability that the outcome of the trial would have been different if the words [Nurse] Friedman uttered, 'sexual assault by [R.K.'s] history,' had been objected to and excluded." *Id.* at 27.

Regarding the prejudice prong of the ineffectiveness test, the PCRA court rejected Appellant's claim:

> [E]ven if [Appellant] could establish that [Nurse] Friedman's testimony improperly bolstered [R.K.'s] testimony under **Maconeghy**, [trial] counsel's failure to object to [Nurse Friedman's] testimony did not prejudice [Appellant], and there is not a reasonable probability that the outcome of the trial would have been different had the court excluded her testimony. Unlike child sexual assault cases where there are no eyewitnesses and the only evidence is the defendant's word against the child's, there was physical evidence to corroborate the child's testimony here. The Commonwealth introduced a towel into evidence that was provided to [police] by R.K., and she testified that she used it to clean herself after [Appellant] assaulted her. The towel tested positive for seminal fluid that positively matched [Appellant's] DNA. Thus, even if [Nurse] Friedman's testimony had been excluded, there was corroborating evidence of a sexual interaction

---

[13] Appellant does not dispute that his semen was on the towel.

between R.K and [Appellant], and [Appellant] has not demonstrated that the outcome of the trial would have been different here.

PCRA Court Opinion, 3/31/25, at 15-16.

Our review of the totality of the evidence suggests that, although Nurse Friedman's opinion testimony was inadmissible as set forth above, Appellant established no prejudice resulting from its admission. Contrary to Appellant's argument, the jury did not "hear an expert testify that [R.K.] was telling the truth about being sexually assaulted." Appellant's Brief at 26. Rather, Nurse Friedman gave an opinion of "[s]exual assault by [R.K.'s] history" that was, at worst, ambiguous as to whether it included Nurse Friedman's own assessment of the R.K.'s credibility. The potential prejudicial impact of this testimony was mitigated on cross-examination, by Nurse Friedman's concession that her opinion was not based on physical findings, and that she "can't tell if something did or did not [happen]." N.T., 10/5/20, at 111-12; *see also Minerd*, 753 A.2d at 232 (noting "defense counsel elicited an explanation [of the physical evidence] which was equally favorable to [the defendant].").[14]

_____

[14] The trial court instructed the jury that "[t]he credibility of the witnesses is entirely for you to determine." N.T., 10/6/20, at 150; *see also id.* at 156 (court's instruction regarding the jury's province to determine the "credibility of the alleged victim"). After instructing the jury regarding expert witnesses, the court advised:

*(Footnote Continued Next Page)*

Regarding Appellant's assertion that he was prejudiced for the same reason as the defendant in **Sansone II**, we do not find **Sansone II** persuasive on the prejudice question. **Sansone II**'s brief prejudice analysis consisted solely of the statement that, "based on **Maconeghy**, we are constrained to conclude [the defendant] was prejudiced by counsel's failure to object to [Nurse Friedman's] inadmissible testimony." **Sansone II**, 2025 WL 1330497, *2. We observe that **Maconeghy** was a direct rather than collateral appeal, and therefore involved the lesser harmless error standard. An ineffectiveness claim involves the "more exacting" **Strickland**/**Pierce** test of actual prejudice, which requires consideration of the totality of the evidence. **Spotz**, 84 A.3d at 315. **Sansone II** does not appear to have applied this test, and we disagree with its conclusion that **Maconeghy**, by itself, can dictate a finding of prejudice in the PCRA/ineffectiveness context.[15] In sum,

_____

> Remember though you, the jury, are the sole judges of the credibility and the weight of all of the testimony. The fact that the lawyers and I may have referred to certain witnesses as experts, and that the witnesses may have special knowledge or skill does not mean that their testimony and opinions are right.

**Id.** at 155-56; **see also Minerd**, 753 A.2d at 232 (determining jury could not have been "unduly influenced" by expert's testimony in part because trial court "clearly advised" the jury that it "was not bound to accept the expert's testimony merely because she possessed special skill or knowledge.").

[15] We further observe that neither **Sansone I** nor **Sansone II** sets forth a detailed recitation of the trial evidence, and **Sansone**'s facts do not appear analogous to the unique facts of the instant case. We note that the jury in **Sansone** acquitted the defendant of the more serious sexual offenses and
*(Footnote Continued Next Page)*

*Sansone II* does not support Appellant's argument that prejudice resulted from Nurse Friedman's opinion testimony.

Rather, the unique facts of the instant case support the PCRA court's conclusion that Nurse Friedman's opinion testimony had no decisive impact on the outcome of Appellant's trial. The *Maconeghy* Court observed that, "[t]o a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat[.]" *Maconeghy*, 171 A.3d at 713 (quoting *Peterson*, 537 N.W.2d at 868). While this may *often* be the case, the instant jury had other, more significant "hook[s] on which to hang its hat," *id.*, including Appellant's admission to a prior sexual relationship with the 16-year-old Ms. Bash and—most significantly—R.K.'s possession of a towel stained with Appellant's semen.

We observe that Appellant's brief neglects to mention Ms. Bash's testimony or Appellant's admission to having had a sexual relationship with her when she was 16. In asserting the trial's outcome would have been different had Nurse Friedman's opinion been excluded, Appellant fails to acknowledge the impact of Ms. Bash's evidence. Our review suggests that

_____

convicted him only of offenses that did not require actual sexual contact. *See Sansone I*, 2024 WL 4432799, *1.

Ms. Bash's testimony, the core of which Appellant conceded was true, strongly corroborated R.K.'s testimony.[16]

Finally, we disagree with Appellant's assertion that the towel's provenance is simply a matter of credibility. Our review of the evidence discloses that Appellant presented contradictory theories regarding R.K.'s purported motive and opportunity. *Compare* N.T., 10/6/20, at 73-74 (Appellant testifying he kept a "go bag" in his vehicle, and that he had the bag during his trip to New York with R.K.), 78 (Appellant testifying that the semen-stained towel "could have" come from the bag in his vehicle), 72 (Appellant agreeing that "[d]uring th[e] time period" of the New York trip, he was still employed with the candy company), *with id.* at 74 (Appellant testifying he "stopped interacting with" R.K. "[t]oward the third week of November" because of his new job hauling frack sand), 77 (Appellant testifying that his lack of interaction with R.K. because of his new job caused a problem for her); *see also Knight*, 290 A.3d 688 (unpublished memorandum at 8) (observing Appellant "posited that [R.K.] had felt abandoned by him when he took a new job, which resulted in him having less time for her. He concluded that this caused [R.K.] to become angry with him and to fabricate the sexual assault

---

[16] We further observe that M.K., *whom Appellant called to testify as a defense witness*, corroborated R.K.'s testimony that Appellant lied about his age and lied about obtaining M.K.'s permission to take R.K. on the New York trip. N.T., 10/6/20, at 54, 59-61. M.K. further testified that she no longer trusted Appellant "because he raped" R.K. *Id.* at 60.

allegation. Appellant's counsel reiterated these themes during his closing argument."). Appellant points to no evidence that R.K. had any access to his belongings *after* he claims she became upset with him.

At trial, Appellant baldly asserted it "[c]ould have been my towel," but he never affirmatively testified that his bag contained a towel, much less one stained with his semen. ***See*** N.T., 10/6/20, at 73-74, 77-78. He also never testified that he had a blue and white towel like the one R.K. produced, or that he had any towel that went missing. ***Id.*** Though Appellant indicated his bag was in the vehicle he used to give R.K. rides, including to New York, he never testified R.K. was ever alone with the bag. ***Id.***

Appellant does not dispute that his semen was on the towel, but he identifies no coherent explanation for this fact that is consistent with his denial that any sexual activity occurred. While we recognize that the Commonwealth bore the burden of proof and Appellant did not have to prove any theory, our review of the evidence discloses that the towel was not simply a credibility issue on which Nurse Friedman's opinion could have tipped the balance in R.K.'s favor.[17]

_____

[17] The trial evidence indicated that, at the time Nurse Friedman examined R.K. and formed her opinion, the towel had not yet been turned over to police, and PSP testing had not yet confirmed the towel was stained with Appellant's semen. ***See*** N.T., 10/5/20, at 102, 119-25; N.T., 10/6/20, at 8, 29.

For these reasons, we cannot conclude the PCRA court abused its discretion in determining Appellant failed to establish a reasonable probability that his trial would have had a different outcome had Nurse Friedman's opinion testimony been excluded. Our review of the totality of the evidence suggests the instant outcome is not one "weakly supported by the record," such that it is "more likely to be affected by errors," but rather is more akin to "one with overwhelming record support." *Lesko*, 15 A.3d at 383 (quoting *Strickland*, 466 U.S. at 696). The admission of Nurse Friedman's opinion testimony, though improper, was not "sufficient to undermine confidence in the outcome of the proceeding." *Collins*, 957 A.2d at 244 (citing *Strickland*, 466 U.S. at 694); *see also Commonwealth v. Huertas*, 605 EDA 2019, 2020 WL 408887 (Pa. Super. 2020) (unpublished memorandum) (holding PCRA petitioner's claim had arguable merit where pediatric expert witness testified she believed child victims were telling the truth about sexual assault, though her exam showed no physical evidence; but petitioner failed to demonstrate actual prejudice, as expert's improper testimony was not of sufficient magnitude to undermine confidence in the verdict). As Appellant failed to establish actual prejudice, his ineffectiveness claim merits no relief.

Order affirmed.


Judgment Entered.



Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/17/2025